IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JOSHUA J. RUFFIN and
QUENTEZ R. RUFFIN,

         Plaintiffs,

vs.                         CASE NO.: 4:11cv00344-RH-WCS

CITY OF TALLAHASSEE, DOUGLAS
CLARK, individually, and IPC
INTERNATIONAL CORPORATION,

         Defendants.
_____/

**MEMORANDUM OF LAW IN SUPPORT OF DOUGLAS
CLARK'S MOTION FOR SUMMARY JUDGMENT**

       Comes now the defendant, DOUGLAS CLARK (hereinafter "Officer

Clark"), by and through undersigned counsel, and in accordance with N.D. Fla.

Loc. Rule 7.1(A), submit his memorandum of law in support of his motion for

summary judgment as to plaintiffs' amended complaint (hereinafter complaint).

## I.     INTRODUCTION

       In this action brought pursuant to 42 U.S.C. § 1983, plaintiffs claim in Count

III of their amended complaint that on July 28, 2007,  Officer Clark, acting within

the scope and authority of his employment as a Tallahassee police officer, illegally

detained plaintiffs and used excessive force against plaintiffs in violation of their

Fourth Amendment rights.

## II.  SUMMARY JUDGMENT STANDARD

In all probability, this Court is well versed in the standard that applies to Motions for Summary Judgment under Rule 56, Fed.R.Civ.P. Essentially, to defeat this motion, plaintiffs must come forward with sufficient evidence of every element that he must prove to prevail at trial.[1] This Court must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[2]  "A motion for judgment as a matter of law will be denied only if 'reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions.'"[3]

In a § 1983 case, such as the instant one, factual disputes in the record do not necessarily mandate the denial of judgment as a matter of law.  In Johnson,[4] the court granted defendant's motion for summary judgment in a § 1983 case alleging excessive force during the execution of a search warrant, and stated:

> The facts as to what occurred during the execution of the warrant are hotly disputed.  However, factual disputes do not preclude a grant of summary judgment premised on a defendant's qualified immunity if the legal norms allegedly violated were not clearly established at the time

---

[1]   Rollins v. Tech South, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).
[2]   Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997), cert. denied sub. nom. Combs v. Meadowcraft, 522 U.S. 1045 (1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).
[3]   Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999), cert. denied 120 S.Ct. 1674 (2000) (quoting Walker v. Nations Bank of Florida, N.A., 53 F.3d 1548, 1555 (11th Cir. 1995)).
[4]   Johnson v. Ft. Pierce Police Department, 849 F.Supp. 1543 (S.D. Fla. 1994).

of the alleged actions.  Thus, <u>in the context of a § 1983 case, summary judgment would be appropriate as a matter of law, notwithstanding factual disputes on the record regarding the defendant's conduct</u>.[5]

In the present case, it is clear that if trial were held tomorrow, plaintiffs could not meet the affirmative evidentiary requirements needed to prove their claims against either Officer Clark or the City.

## III.   STATEMENT OF FACTS

On July 28, 2007, Officer Clark was employed by the Tallahassee Mall in his capacity as a Tallahassee police officer to assist Tallahassee Mall security officers when and where law enforcement was required.[6]  At all pertinent times he was acting within the scope and authority of his duties as a Tallahassee police officer, even though he was employed by the Tallahassee Mall.[7]

At approximately 8:45 p.m., on July 28, 2007, Mall security officer Tom Arnold contacted Officer Clark by radio and advised him that four black males were engaging in disorderly conduct and that Mall security needed his assistance.[8] Mr. Arnold advised Officer Clark that one of the suspects had pulled down his pants and exposed his buttocks.[9] Having been given reliable information that the crime of disorderly conduct had been committed by one of these four males,

---

[5]   <u>Id</u>. at 1548 (Emphasis added).
[6]   Exhibit D at ¶ 2.
[7]   <u>Id</u>.
[8]   Exhibit D at ¶ .
[9]   <u>Id</u>.

Officer Clark concluded that he had the authority to temporarily detain the

individuals for the purpose of ascertaining their identity and investigating whether

there was probable cause to show that a crime had been committed; if so he

intended to issue the young men a trespass warning.[10]

Upon receipt of the radio communication from Mr. Arnold, Officer Clark

drove his marked police car to a Tallahassee Mall parking lot south of the AMC

theatre where he intercepted the four suspects. When he stopped his police car it

was facing in a northerly direction and blocked the path of the four suspects.

Officer Clark was in his police uniform.[11]

From Officer Clark's observations and perceptions, when he got out of his

police car he observed four black males, one of whom was about 6'5" tall and well

over 250 pounds, one of whom was about 6'5" tall and about 200 pounds and two

other average size males.  Officer Clark told the suspects to get against his car.  All

but the largest of the suspects (Quentez Ruffin) generally obeyed his command.

Quentez Ruffin refused to get against the car and responded with "What!" in an

aggressive manner. Officer Clark told Quentez Ruffin that he had to stop for his

investigation, but Quentez Ruffin refused and continued to move around. Because

Quentez Ruffin was wearing very baggy clothing, Officer Clark became concerned

---

[10]    Id.
[11]    Exhibit D, ¶ 4.

that Quentez Ruffin could be armed. When Officer Clark tried to pat him down for weapons, Quentez Ruffin lifted his hand and pulled away from Officer Clark to keep him from patting him down, which constituted active physical resistance.[12] These factors caused Officer Clark's level of fear to increase so he called for backup. As Quentez Ruffin continued to resist, Officer Clark feared that he was losing control of the situation and that Quentez Ruffin might assault him, pull a weapon or flee the scene. Officer Clark drew his Taser, pointed it at Quentez Ruffin and told him to get to his knees.  At this time Joshua Ruffin came into his view and fearing that Joshua Ruffin would try to assist his brother, he told Joshua Ruffin to back away; when he did not, Officer Clark pointed the Taser at him and again told him to back away.  After getting no response, Officer Clark kicked Joshua Ruffin on his left outer thigh with his right foot.  Joshua Ruffin immediately fell to the ground where he remained. Officer Clark again turned his attention toward Quentez Ruffin and again told him more than once to get to his knees or be tased. Quentez Ruffin refused to get to his knees and Officer Clark touch stunned (aka "drive stun") him in his right waist area.[13] Quentez Ruffin went to his knees but attempted to get up and Officer Clark touch stunned his leg area three additional times, after which Quentez Ruffin finally got on the ground.

---

[12]       Exhibit D, ¶ 5.
[13]       TPD Policy No. 7 relating to the Tasers (Electronic Control Device) defines a touch stun as follows:  "The application of the device (Taser) to a subject by making direct contact with the body after the DSFG air cartridge has been expended or remove. See Exhibit M.  **NOTE:**  The terms tase, tased, drive or drove stunned or touch stunned are used interchangeably to mean that the Taser was applied in this case only in the touch stun mode.

Although Officer Clark touch stunned Quentez Ruffin four times, he only used the Taser twice.[14]  Approximately eleven seconds elapsed between the first touch stun and when Quentez Ruffin finally got on the ground.[15]

According to Quentez Ruffin, as he and Joshua Ruffin approached Officer Clark's police car, Officer Clark told them to get against his car and they complied with that command. Officer Clark told Quentez Ruffin to get on the ground, but he refused to immediately and fully comply with his command.[16] Officer Clark also told Joshua Ruffin to get on the ground, but he also failed to immediately and fully comply with that command.[17] Because Joshua Ruffin was not complying with his commands,[18] Officer Clark was thus concerned that Joshua Ruffin might come to his brother's aid and told him to back away.[19] From Officer Clark's perspective, not only was Quentez Ruffin refusing to comply with his commands, now Joshua Ruffin was also refusing to do so.  Joshua Ruffin contends that he told Officer Clark that he was getting down slowly because he was recovering from a knee injury;[20]  however, Joshua Ruffin testified in his deposition that at the time Officer Clark kicked his left knee that it was "…actually very strong.  My surgically-

---

[14]     Exhibit K and Exhibit D, ¶ 6.
[15]     Exhibit D, ¶ 6.
[16]     Exhibit A, pp. 152 and 232-233.
[17]     Exhibit I, answer to Interrogatory No. 7.
[18]     Officer Clark recalls giving Joshua Ruffin the command to back away in addition to stating several times to Quentez Ruffin to get on the ground. Officer Clark concedes that it is likely that he also told Joshua Ruffin to get on the ground. (Exhibit D, ¶ 7).
[19]     Exhibit D, ¶ 6.
[20]     Exhibit I, answer to Interrogatory No. 7.

repaired knee was stronger than my good knee."[21]  Moreover, Officer Clark never heard Joshua Ruffin make any such statement[22]

Fearing he was losing control of the situation, Officer Clark pulled his Taser, pointed it at both Quentez and Joshua Ruffin and then kicked Joshua Ruffin on his left leg to force him to the ground so that he could turn his sole attention to Quentez Ruffin, who had still not got on the ground as commanded.[23] Joshua Ruffin went to the ground after the kick and remained there.[24]  Because Officer Clark perceived that Quentez Ruffin was refusing his command to get on the ground, Officer Clark decided to use his Taser in a touch stun mode to force Quentez Ruffin to the ground.[25] Officer Clark first touch stunned Quentez Ruffin in his right waist area, then three additional times on his right leg, at which time he got on the ground.[26]  Approximately eleven seconds elapsed between the first touch stun and when Quentez Ruffin finally got on the ground.[27]

Joshua Ruffin and Justin Bronson also perceived and testified that Quentez Ruffin was on his feet or knees when Officer Clark tased him. Joshua Ruffin testified: (1) that after he hit the ground, he saw Officer Clark tase Quentez Ruffin

---

[21]     Exhibit B, p. 28.
[22]     Exhibit D, ¶ 7.
[23]     Exhibit D, ¶ 6.
[24]     Id.
[25]     Id.
[26]     Id.
[27]     Id. and Exhibit K.

in his upper thigh area twice and a bit higher up a third time; [28] and, (2) that Quentez Ruffin was tased a third time because he was told to get on the ground and he had not done so; instead he was on one knee not really all the way down.[29] When asked what happened after Quentez Ruffin was completely on the ground, Joshua Ruffin gave no testimony that Quentez Ruffin had been tased again.[30]

Justin Bronson testified: (1) that he did not recall Quentez Ruffin being kicked, but he saw him get tased and then go to the ground, possibly to his knees;[31] (2) that the tasing came quickly after Officer Clark kicked Joshua Ruffin;[32] and, (3) that he did not see Quentez Ruffin try to go to the ground before being tased.[33]

In his deposition taken on November 17, 2011, Joshua Ruffin first claimed that his hand had been stomped on while using his cell phone to call for help after he was kicked by Officer Clark on July 28, 2007.[34] When asked who stomped his hand Joshua Ruffin stated that he was "pretty sure" it was Officer Clark.[35] He also stated that he was "…not really sure if this (the stomping) happened right after, but when I was frisked or patted down, or whatever".[36] Joshua Ruffin also testified: "that's when my hand got **stepped on or the phone got kicked out of my hand**,

---

[28] Exhibit B, p. 119.
[29] Exhibit B, p. 121-122.
[30] Exhibit B, p. 126.
[31] Exhibit E, pp. 41-42.
[32] Exhibit E, p. 60.
[33] Exhibit E, p. 61
[34] Exhibit B, pp. 88-89, 101 and 125.
[35] Exhibit B, p. 89.
[36] Id.

whatever you want to call it."[37] He also stated that when he was on the phone, "…I guess when **he stepped on**, my thumb got bent all the way back."[38] He also testified that he was not sure if Officer Clark stomped down or if he kicked the phone.[39]  Officer Clark testified that he never stomped on, kicked, or stepped on Joshua Ruffin's hand on July 28, 2007.[40]

When asked by emergency medical personnel how he was injured, Joshua Ruffin never mentioned his hand even being hurt.[41] Nor did Joshua Ruffin tell medical personnel at the Capital Regional Medical Center Emergency Room that his hand had been injured by being stepped on, stomped or kicked.[42] Likewise, when Joshua Ruffin went to the Tallahassee Orthopedic Clinic for rehabilitation for his right hand on August 7, 2007, the intake notes show that Joshua Ruffin "…states that he was stopped by the police department and kicked on the lateral aspect of his left knee.  He fell and his thumb jammed into the ground as well as his wrist was slightly dorsiflexed."[43]

In February 2008, Joshua Ruffin provided to the City of Tallahassee a notice of intent to sue.[44] In his notice to sue Joshua Ruffin states that he was then kicked on his left leg, knocking him to the ground, "**injuring his wrist**" and hurting his

---

[37]     Exhibit B, p. 120 (Emphasis Added).
[38]     Exhibit B, p. 124 (Emphasis Added).
[39]     Id.
[40]     Exhibit D, ¶ 8.
[41]     Exhibit F.
[42]     Exhibit G.
[43]     Exhibit M.
[44]     Exhibit H.

leg.[45] In both his complaint (Doc. 1-1) and amended complaint (Doc. 8), Joshua Ruffin states in ¶ 10 thereof that Officer Clark kicked him on his left leg and that he "…sustained a wrist injury by virtue of Clark's kick…." He further states in ¶ 10 that Officer Clark "kicked the phone from his hand."[46]

After Joshua Ruffin was kicked, he went to the ground and almost immediately Officer Clark began tasing his brother.[47]  At this time Joshua Ruffin was on his right side, very close to and facing the police car and looking up at its front bumper.  He was holding his left knee with his left hand and holding his cell phone with his right hand to his right ear and speaking with his mother and/or grandmother; thus, his cell phone and right hand were located between the right side of his head and the ground.[48] Officer Clark and Quentez Ruffin were behind Joshua Ruffin and by his feet.[49] When asked to explain how Officer Clark could possibly have stomped on his right hand that was protected by his body while he was tasing his brother, his only explanation was that Officer Clark must have stomped on his hand between the first and second times that Quentez Ruffin was tased.[50]

---

[45]     Id (Emphasis Added).

[46]     Thus, the first allegation that Officer Clark stepped on, stomped or kicked Joshua Ruffin's right hand came at his deposition taken on November 11, 2011. Joshua Ruffin was asked by IPC in its Frist Interrogatories to describe in detail what happened and how he was injured, but did not mention that his right hand had been stepped on, stomped or kicked by Officer Clark or that his hand had been injured by any such action by Officer Clark. See Exhibit "I," Joshua Ruffin's answer to Interrogatories Nos. 7 and 8.

[47]     Exhibit B, at pp. 101 and 115.

[48]     Exhibit B at pp. 211-217.

[49]     Exhibit B, at pp. 112- and Exhibit J.

[50]     Exhibit B, at p. 216.

The kick and the tasing took seconds according to Quentez Ruffin[51]  and happened back to back according to Joshua Ruffin.[52] According to the Taser log, the tasing took eleven seconds.[53] In all probability about 15 seconds or less elapsed from the time Officer Clark kicked Joshua Ruffin and stopped tasing Quentez Ruffin.[54]

 Back up arrived on scene and both Quentez and Josh Ruffin were handcuffed and placed in separate police cars. During the search of Quentez Ruffin incident to arrest, Officer Clark found a tobacco grinder and a plastic bag that both appeared to have cannabis residue. Both the grinder and plastic bag were sent to FDLE for testing and both tested positive for cannabis.[55]

Quentez Ruffin was given a Notice to Appear for the charges of possession of paraphernalia and for resisting arrest without violence and released. Joshua Ruffin was given a trespass warning and released.[56] Subsequently, Joshua Ruffin was charged with trespass after warning, and Quentez Ruffin was charged with disorderly conduct. Officer Clark had nothing to do with investigating or filing these charges.[57]

---

[51]      Exhibit A, at p. 160.
[52]      Exhibit B, at p. 101.
[53]      Exhibit K and Exhibit D, ¶ 9.
[54]      Exhibit D, ¶ 9.
[55]      Exhibit D, ¶10.
[56]      Exhibit D, ¶ 11.
[57]      Exhibit D, ¶12.

Quentez Ruffin's alleged injuries were neither serious nor permanent and he was playing college football by January 2008 and had been offered a full football scholarship to the University of Tennessee.[58]  Likewise, Joshua Ruffin's alleged injuries were neither serious nor permanent, and by August 27, 2007 (the beginning of the 2007 fall semester), he was able to compete well at the level of college basketball.[59]

## III     ARGUMENT

## A.     THE DOCTRINE OF QUALIFIED IMMUNITY SHIELDS OFFICE CLARK FROM INDIVIDUAL LIABILITY

Officer Clark is being sued in his individual capacity under § 1983 and is entitled to qualified immunity.[60]  This immunity is not only from liability but also from suit.[61]  Qualified immunity protects government officials performing discretionary functions not only from civil liability, but also from discovery and trial, if their conduct violates "no clearly established statutory or constitutional rights of which a reasonable person would have known."[62]  A police officer accused of a Fourth Amendment violation is entitled to qualified immunity if his actions are objectively reasonable.[63]

---

[58]     Exhibit A, pp. 54-56.
[59]     Exhibit C and Exhibit B, pp. 176-79 and 204.
[60]     Riebsame v. Prince, 267 F.Supp.2d 1225, 1231 (M.D. Fla. 2003).
[61]     See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982); see also GJR Investments, Inc. v. County of Escambia, 132 F.3d 1359, 1366 (11th Cir. 1998).
[62]     Post v. City of Fort Lauderdale, 7 F.3d 1552, 1556 (11th Cir. 1993); and Lassiter v. Alabama A & M Univ. Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994).
[63]     See Graham v. Connor, 490 U.S. 386 (1989); Nolin v. Isabell, 207 F.3d 1253 (11th Cir. 2000); Priester v. City of Riviera Beach, 208 F.3d 919 (11th Cir. 2000).

Plaintiffs' allegations and the affidavits presented by Officer Clark conclusively show that he was acting within the scope of his discretionary authority when plaintiffs were detained, handcuffed and/or searched; thus Officer Clark is entitled to qualified immunity, and the burden shifts to plaintiffs to show that qualified immunity is not appropriate.[64]  To overcome qualified immunity, each plaintiff must demonstrate that Officer Clark's conduct violated "clearly established (federal) statutory or constitutional rights of which a reasonable person would have known."[65]

This Court has the discretion whether to follow the two-step sequence for resolving government officials' qualified immunity claims established in Saucier v. Katz,[66] or to decide which of the two prongs should be addressed first in light of circumstances in the particular case at hand.[67]  In the instant case the Saucier analysis seems appropriate.  Thus the Court must decide whether the facts alleged, assuming they are true, demonstrate that Officer Clark violated each plaintiff's constitutional right. Only if this first query is answered in the affirmative does this Court proceed to the second query, which is to determine whether the right violated was clearly established. Based on the record and the undisputed facts, it is

---

[64]     Vineyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002).
[65]     GJR, 132 F.3d at 1366; and Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (11th Cir. 2003).
[66]     533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).
[67]     Case v. Eslinger, 555 F.3d 1317, 1325-26 (11th Cir. 2009).

abundantly clear that neither plaintiff can make a credible showing that Officer

Clark violated a constitutional right.

**B.**   **PLAINTIFFS' FALSE IMPRISONMENTCLAIMS**

**1.**   **PLAINTIFFS HAVE FAILED TO ESTABLISH A CONTITUTIONAL VIOLATION FOR THEIR CLAIMS OF FALSE IMPRISONMENT[68]**

In Florida, the tort of false imprisonment is the unlawful detention of the

plaintiff without color of law that deprives him/her of his liberty.[69] The detention

must be unreasonable and not warranted by the circumstances.[70]

Here, plaintiffs allege that Tallahassee Mall security personnel had

demanded that plaintiffs leave the mall, that due to plaintiffs' actions Officer Clark

was summoned to plaintiffs' location and that "Mall security had told Clark that

the plaintiffs were being disorderly inside the mall."[71]  It is now undisputed that

Mall Security gave Officer Clark reliable information that these four suspects had

allegedly committed a crime—i.e., the crime of disorderly conduct.[72]

Thus, it is conclusively established that Officer Clark had a reasonable and

lawful basis to detain the four suspects, including plaintiffs to ascertain their

identity and investigate the allegations made by Mall Security so as to determine

---

[68]    Officer Clark adopts the arguments made herein as his arguments that plaintiffs have failed to establish their state law claims for false imprisonment as set out in Count V of their complaint.
[69]    <u>Spears v. Albertson's, Inc.</u> 848 S. 2d 1176 (Fla. 1st DCA 2003).
[70]    <u>Id</u>.
[71]    Doc. 8 at ¶ 10.
[72]    Fla. Stat. Ann. § 877.03.

whether he could issue a trespass warning to one or more of the suspects.[73]  Thus, it is now indisputable that Officer Clark acted under color of law, and his detention of plaintiffs was reasonable and warranted under the circumstances.[74]

As to Joshua Ruffin, after he was detained for investigation Officer Clark gave him a trespass warning on behalf of the Tallahassee Mall and released him. He was not arrested and his detention was reasonable.

As to Quentez Ruffin, during the lawful detention, Officer Clark observed him engage in resisting arrest without violence and in the possession of paraphernalia, both of which were misdemeanor violations of Florida criminal law. Since Officer Clark observed both misdemeanor violations, he had probable cause to arrest Quentez Ruffin for both crimes.  In Florida, a police officer may arrest a person without a warrant when the person has committed a misdemeanor in the officer's presence.[75] In lieu of taking Quentez Ruffin to jail, Officer Clark issued him a notice to appear.

The existence of probable cause at the time of arrest constitutes an absolute bar to a § 1983 action for false arrest.[76]  It is well settled that "…if an officer has probable cause to believe that an individual has committed even a minor criminal

---

[73]     Fla. Stat. Ann. § 901.151(2).
[74]     Terry v. Ohio, 392 U.S. 1 (1968).
[75]     Fla. Stat. Ann. § 901.15(1).
[76]     Marx v. Gumbinner, 905 F.2d 1503, 1505-06 (11th Cir.1990).

offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."[77]

While it is clear that Officer Clark had probable cause to detain Joshua Ruffin and to arrest Quentez Ruffin, Officer Clark also would show to the Court that he undoubtedly had **arguable** probable cause to both detain and arrest, which is "all that is required for qualified immunity to be applicable to the an arresting officer."[78]

Since plaintiffs' version of the facts clearly fails to establish a constitutional violation, Officer Clark is entitled to qualified immunity, as a matter of law, to their claim for false imprisonment.[79]

## 2.  PLAINTIFFS CANNOT SHOW THAT THE CONSTITUTIONAL RIGHT THEY CLAIM WAS VIOLATED WAS CLEARLY ESTABLISHED

Even if plaintiffs could allege sufficient facts to plausibly show a violation of a constitutional right, which they have failed to do in their amended complaint, they cannot show that such right was "clearly established."  Plaintiffs would have to point to a law from the United States Supreme Court, the Florida Supreme Court, or to words from a federal statute or federal constitutional provision which clearly established that it was unlawful for a police officer to rely on Fla. Stat. § 901.151 to detain plaintiffs in order to investigate their conduct as reported by Mall

---

[77]    Lee v. Ferraro, 284 F.3d 1188, 1194-95 (11th Cir.2002); and Storck, 354 F.3d at1314.
[78]    Lee, 284 F.3d at 1195.
[79]    Storck, 354 F.3d at1314.

security and/or to arrest a person who committed a misdemeanor in his presence.[80]

This plaintiffs cannot do.

## C.    PLAINTIFFS' EXCESSIVE FORCE CLAIMS

## 1.    PLAINTIFFS HAVE FAILED TO ESTABLISH A CONTITUTIONAL VIOLATION FOR THEIR CLAIMS OF EXCESSIVE FORCE [81]

It is well settled that the right to make an arrest or investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."[82]  In an excessive force case, "qualified immunity applies unless application of the standard would inevitably lead every reasonable officer ... to conclude the force was unlawful."[83]

In determining whether an officer's use of force was objectively reasonable, the Court should consider a variety of factors including: "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, and (3) the extent of the injury inflicted.[84]  The Court should also consider "the severity of the crime, whether the suspect pose[d] an immediate threat, and whether the suspect [was] resisting or fleeing."[85]

---

[80]     Storck, 354 F.3d at1317-18; and Lee, 284 F.3d at 1197.
[81]     Officer Clark adopts the arguments made herein as his arguments that plaintiffs have failed to establish their state law claims for battery as set out in Count II of their complaint.
[82]     Graham, 490 U.S. at 396, 109 S.Ct. at 1871-72; Vineyard, 311 F.3d at 1347; Lee, 284 F.3d at 1197; Crosby v. Monroe County, 394 F.3d 1328, 1333-34 (11th Cir. 2004).
[83]     Post, 7 F.3d at 1559; Gold v. City of Miami, 121 F.3d 1442, 1446 (11th Cir.1997), cert. denied, 525 U.S. 870 (1998).
[84]     Graham, 490 U.S. at 396, 109 S.Ct. at 1871-72; Vineyard, 311 F.3d at 1347; Lee, 284 F.3d at 1197.
[85]     Post, 7 F.3d at 1559.

When analyzing these factors as to the facts of this case, it is clear that Officer Clark's use of force was objectively reasonable.  The fact that both Quentez Ruffin and Joshua Ruffin admittedly were resisting (not immediately obeying Officer Clark's command to get on the ground), weighs in Officer Clark's favor and objectively demonstrates some force was needed.  The amount of force used (a single kick and Taser used twice) was minimal, as was the injuries allegedly inflicted. There were no broken bones or other serious injury; Quentez Ruffin was playing college football a few months later and Joshua Ruffin was playing college level basketball in approximately September 2007.

In determining whether each officer's use of force was objectively reasonable under the totality of the circumstances, while the facts are viewed in the light most favorable to plaintiff, the determination of reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving."[86]

---

[86]     Graham, 490 U.S. 396-97; Garrett v. Athens-Clarke County, Ga., 378 F.3d 1274, 1279 (11th Cir.2004).

The admonition in <u>Crosby v. Monroe County</u>,[87] that the Court should try to place itself in the shoes of the officers when deciding excessive force claims is especially appropriate to the facts of this case.  In <u>Crosby</u>, the Court stated:

> In making an excessive force inquiry, we are not to view the matter as judges from the comfort and safety of our chambers, fearful of nothing more threatening than the occasional paper cut as we read a cold record accounting of what turned out to be the facts. We must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal.[88]

Simply put, given the totality of the circumstances which faced Officer Clark at the scene and the events that developed after he tried to detain plaintiffs, there is no evidence sufficient to show that the force used was unreasonable.

## 2.     THE TOTALITY OF THE FACTS AND CIRCUMSTANCES FACING OFFICER CLARK

In evaluating all of the factors relating to whether force was needed, including (1) the severity of the crimes, (2) the danger the officers perceived at the scene, and (3) the risk of plaintiff fleeing the scene, the Court must take itself out of the safety of the "courthouse" and place itself in the "streets" with Officer Clark.

Officer Clark's perception of the danger caused by plaintiffs' actions is well documented and indisputable.  Officer Clark was without any law enforcement

---

[87]     394 F.3d 1328 (11th Cir. 2004).

[88]     <u>Id</u>. at 1333-34.

backup.  He was confronted by four male suspects who had been reported to have

acted disorderly.  One of the suspects was over 6'5" and weighed over 250 pounds;

another was 6'5" and weighed around 200 pounds.  During his initial encounter

with the four suspects, three of them obeyed his initial command to get by his car.

The biggest of the suspects refused and appeared aggressive and would not stay

still.  That suspect had on baggy clothes, and Officer Clark feared that he could

have a concealed weapon, so he told him that he wanted to pat him down, but the

suspect refused and backed away from Officer Clark, further raising Officer

Clark's level of fear.  Officer Clark lost sight of the two other suspects and feared

that he was losing control of the situation and that the largest suspect might either

attack him or attempt to flee.  Officer Clark then drew his Taser and pointed it at

each of the two larger suspects and told them to get on the ground or back away,

but neither one complied with those commands.[89]  Fearing that if he used the Taser

in the dart mode the more slender suspect might come to the aid of the larger

suspect, Officer Clark took the cartridge off of the Taser so that it could be used as

a "stun" gun to touch/drive stun the larger suspect. To keep the more slender

suspect from assisting the larger one, Officer Clark successfully kicked him in the

left thigh area to get him to go to the ground.  Officer Clark then turned his

attention back to the larger suspect and told him to get on the ground or he would

---

[89]        Each plaintiff has admitted that he resisted by failing to comply with Officer Clark's command to get on the ground.

be tased, but he refused, so Officer Clark touch stunned him on his right waist.

The suspect went to his knees but tried to get back up so Officer Clark again told

him to stay down or he would be tased, and when he did not, Officer Clark touch

stunned him three additional times on his right leg until he got to the ground and

stayed there.  After backup arrived, each of the two suspects on which force was

used was handcuffed and placed in a police car without further incident.

Viewing the totality of the encounter that Officer Clark had with Quentez

and Joshua Ruffin, and placing oneself in Officer Clark's shoes, it was objectively

reasonable under the situation he was in for him to have resorted to a single kick to

Joshua Ruffin's leg and to use the Taser twice on Quentez Ruffin.

A single kick to the leg is relatively low on the continuum of force options

then available to Officer Clark, and the principle is well established in the Eleventh

Circuit "that the application of de minimis force, without more, will not support a

claim for excessive force in violation of the Fourth Amendment."[90]

In past excessive force cases, the Eleventh Circuit Court of Appeals has

determined that the following uses of force were de minimis: (1) pushing a

handcuffed arrestee up against a wall because the arrestee spoke after being told to

"shut up;"[91] (2) slamming a suspect against a wall and kicking his legs apart

---

[90]     Nolin, 207 F.3d at 1257.

[91]     Post, 7 F.3d at 1556 .

21

without provocation;[92] (3) grabbing an arrestee from behind, shoving him a few feet against a vehicle, and pushing him up against a van, which resulted in minor bruising but did not require medical treatment;[93] (4) handcuffing so tightly twenty minutes causing arrestee pain and skin abrasions;[94] and, (5) grabbing the arrestee from behind, pulling him to the ground while struggling to pin his harms behind him and kneeing and handcuffing him.[95]

The courts in <u>Nolin</u>, <u>Jones</u>, <u>Post</u> and <u>Durruthy</u> each commented that the force used may have been "unnecessary," but not excessive.  In the instant case the force used by Officer Clark was minimal, but more importantly, necessary to effect detention of both plaintiffs.

Quentez Ruffin is likely to argue that the Court should ignore the totality of this quickly escalating and potentially dangerous situation facing Officer Clark and dwell only upon the last few seconds, where Quentez Ruffin believes he was on the ground when he was tased. This the Court should not do.  Quentez Ruffin may have believed he was on the ground when Tased. But from Officer Clark's reasonable perception (corroborated by both Joshua Ruffin and Justin Bronson, who testified that Quentez Ruffin was not on the ground when he was tased by Officer Clark) of this rapidly moving situation (approximately fifteen seconds from

---

[92]   <u>Jones v. City of Dothan</u>, 121 F.3d 1456, 1458 (11th Cir. 1997).
[93]   <u>Nolin</u>, 207 F.3d at 1258 n.4.
[94]   <u>Gold</u>, 121 F.3d at 1146-47.
[95]   <u>Durruthy v. Pastor</u>, 351 F.3d 1080, 1085 (11th Cir.2003).

kick to end) Quentez Ruffin was not yet on the ground, and it was not guaranteed that Joshua Ruffin would remain on the ground.  Officer Clark perceived that he had to get immediate control of the situation before it escalated to an even more dangerous level.

While a Taser deployment is probably a more intensive type of use of force than a single kick, the use of a Taser in less high risk circumstances than faced Officer Clark have been held to be reasonable or not contrary to clearly established law.[96]

## 3.   PLAINTIFFS CANNOT SHOW THAT ANY CONSTITUTIONAL RIGHT THEY CLAIM WAS VIOLATED WAS CLEARLY ESTABLISHED

Even if plaintiffs could present sufficient facts to show a violation of a constitutional right, which they have yet to do here, they cannot show that such right was "clearly established" at the time of their detention on July 28, 2007. Liability only attaches if "[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that

---

[96]     Draper v. Reynolds, 369 F3d 1270 (11th Cir. 2004) (approved pre-arrest Taser deployment on an ornery and difficult truck driver who was merely "belligerent, gestured animatedly, appeared excited and spoke loudly", who put the officer "on the defensive." ); Dargan v. Hernandez-Vega, 2006 U.S. Dist. Lexis 12723 (M.D. Fla. 2006) (Taser deployment was approved as being not clearly contrary to law when used on a misdemeanor arrestee who simply walked by two Sheriff's deputies); Buckley v. Haddock, 292 Fed. Appx 791 (11th Cir. 2009) (Taser used several times upon a person who refused to sign a citation and refused to move to the patrol vehicle but who offered no active physical resistance held to be reasonable).

right."[97]  In other words, Officer Clark is entitled to "fair warning" that his conduct

deprived each plaintiff of a constitutional right.[98]

It is well established that only Supreme Court cases, Eleventh Circuit case

law, and Florida Supreme Court case law can clearly establish law in this circuit.[99]

There are no factually similar cases, nor is there reasoning in cases from the

Supreme Court of the United States, the Eleventh Circuit Court of Appeals, the

Supreme Court of Florida, or any other federal law, which put Officer Clark on fair

notice that his conduct violated clearly established Fourth Amendment standards.

Since there is no prior case law or general principle applicable to this case,

the only option left for plaintiff is to try to show Officer Clark's conduct in this

case was so egregious and so obviously violated the constitution that prior case law

is unnecessary.[100] This plaintiffs have not done, and cannot do.

Any legal principles in place as of July 28, 2007, that might be interpreted to

determine plaintiffs' rights were violated by Officer Clark's actions are too

generalized to serve as clearly established law providing fair notice to Officer

Clark that his actions were unreasonable in this factual context. In short, assuming

arguendo that plaintiffs could establish that any of Officer Clark's actions violated

---

[97]     United States v. Lanier, 520 U.S. 259, 270, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997).
[98]     Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).
[99]     Thomas ex rel. Thomas v. Roberts, 323 F.3d 950, 955 (11th Cir. 2003).
[100]    Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005), citing Hope v. Pelzer, 536 U.S. at 741.

24

their constitutional rights, they cannot establish that the law was clearly established in this specific factual context as of July 28, 2007.

Officer Clark's actions against plaintiffs on July 28, 2007, were not unconstitutional. Nor were his actions in violation of clearly established law. Accordingly, Officer Clark should be granted summary judgment as to plaintiff's claims of excessive force based upon the protections of qualified immunity.

**D.   PLAINTIFFS HAVE FAILED TO ESTABLISH THEIR STATE LAW CLAIM FOR INTENTIONAL INFLICTION OF EMTIONAL DISTRESS**

The City adopts Officer Clark's arguments set out in Part III B and C above in support hereof.  The record evidence does not rise to the level of egregious conduct sufficient to sustain plaintiffs' Count CII claim of intentional infliction of emotional distress as a matter of law.[101]

Should the Court decline to enter summary judgment only as to plaintiffs' state law claims, Officer Clark encourages the Court to dismiss those claims and let them be addressed in a state court forum.[102]

**IV.   CONCLUSION**

For the foregoing reasons, Officer Clark requests this Court grant his motion for summary judgment and enter judgment in his favor and against plaintiffs.

---

[101]   <u>Eastern Airlines, Inc. v. King</u>, 557 So.2d 574 (Fla. 1990).
[102]   <u>Raney v. Allstate Ins. Co.</u>, 370 F 3d 1086, 1089 (11th Cir. 2004).

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic mail via CM/ECF to Marie A. Mattox,, Esq., and Ganesh Chatani, Esq. on this 28th day of  March 2012.

<u>*s/ Billy J. Hendrix*</u>
BILLY J. HENDRIX
Assistant City Attorney
FBN:  849529
City Attorney's Office
300 South Adams Street, Box A-5
Tallahassee, FL 32301
(850) 891-8554
Fax: (850) 891-8973
Billy.Hendrix@talgov.com
ATTORNEYS FOR DOUGLAS CLARK
AND THE CITY OF TALLAHASSEE