IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


JOSHUA J. RUFFIN and
QUENTEZ R. RUFFIN,

       Plaintiffs,

vs.                     CASE NO.: 4:11cv00344-RH-WCS

CITY OF TALLAHASSEE, DOUGLAS
CLARK, individually, and IPC
INTERNATIONAL CORPORATION,

       Defendants.
_____/

**MEMORANDUM OF LAW IN SUPPORT
OF THE CITY OF TALLAHASSEE'S
<u>AMENDED MOTION FOR SUMMARY JUDGMENT</u>**

Comes now the defendant, CITY OF TALLAHASSEE (hereinafter "the

City"), by and through undersigned counsel, and in accordance with N.D. Fla. Loc.

Rule 7.1(A) submits its memorandum of law in support of its amended motion for

summary judgment as to plaintiffs' amended complaint (hereinafter complaint).

**I.      INTRODUCTION**

In this action brought pursuant to 42 U.S.C. § 1983, plaintiffs claim in Count

III of their amended complaint that on July 28, 2007,  Officer Clark, acting within

the scope and authority of his employment as a Tallahassee police officer, illegally

detained plaintiffs and used excessive force against plaintiffs in violation of their

Fourth Amendment rights. Plaintiffs also claim in Count III of their complaint that the City is liable to plaintiffs under 42 U.S.C. § 1983 for Officer Clark's actions based on deliberate indifference in training, supervision and discipline and because City policy or custom caused plaintiffs' Fourth Amendment rights to be violated. Plaintiffs also make state law claims against the City for battery (Count I) and false imprisonment (Count IV).

## II.    SUMMARY JUDGMENT STANDARD

The City adopts as its STANDARD OF REVIEW, by this reference thereto, the STANDARD OF REVIEW set out in Officer Clark's memorandum of law.

## III.    STATEMENT OF FACTS

The City adopts the Statement of Facts submitted by co-defendant, Douglas Clark as set out in Part III of his memorandum of law in support of his motion for summary judgment. In addition to the facts adopted, the City also submits the following undisputed facts in support of its motion for summary judgment.

## A.    TRAINING

Since May 22, 2007, Dennis Jones (Chief Jones) has been employed as the Police Chief with the City's Police Department (TPD). Prior to his employment with TPD, he was employed as the Police Chief of Daytona Beach, Florida, and prior thereto he had been employed in various capacities as a law enforcement

officer beginning in October 1978.  Chief Jones is currently a member of the

Standards Commission for the Florida Criminal Justice Standards and Training

Commission. As to all matters but ultimate discipline, Chief Jones was and is the

final decision-maker for TPD. He is also the agency head of TPD and in that

capacity has personal knowledge of its policies, procedures, and training programs,

including those in effect prior to becoming agency head.[1]

At all times relevant hereto, TPD maintained an extensive training program

for newly hired police officers. Before an individual could begin work as a police

officer with TPD, several criteria had to have been met. First, the candidate had to

have completed law enforcement training at a Florida Criminal Justice Standards

and Training Commission (CJSTC)-certified training center pursuant to Chapter

943, Florida Statutes. Second, the candidate had to have taken and successfully

passed the state certification exam (known as the State Officer Certified Exam)

prior to becoming certified by the CJSTC. Third, the candidate had to have

completed approximately three weeks in TPD's in-house training program that

consisted of training in the classroom and approximately 14 weeks of training in

the field with a Field Training Officer (FTO). Fourth, each candidate was placed

on a probation where on-the-job performance was regularly reviewed and

evaluated to determine whether the candidate would achieve permanent status as

---

[1]     Exhibit N, ¶ 2. NOTE: All exhibits referenced herein are attached to defendants' motion for summary

an officer.  Officers who did not satisfy these criteria were not retained. Officer Douglas Clark (Officer Clark) satisfied these criteria at the time he was hired and has been and is now in permanent status.[2]

At a minimum, every TPD police officer, including Officer Clark, must successfully complete training in various topics, including areas relating to <u>Terry</u> stops, the constitutional requirement that an arrest must be based upon adequate probable cause and the constitutionally permissible use of force. A yearly in-service training is also provided to TPD officers addressing a variety of topics, including proper detentions, arrests and use of force. In addition, each police officer issued a Taser must receive training on the proper and constitutional use of the Taser, pass a test relating thereto and become certified in its use.  Thereafter, each officer issued a Taser must become re-certified annually.  Each police officer is and was also well trained, counseled, encouraged, and always expected to uphold the law, not to break the law.[3]

In addition to the above required formal training, TPD officers, including Officer Clark, go through additional formal training from outside organizations that assist them in staying current on the most advanced law enforcement

---

judgment.

[2]       Exhibit N, ¶ 3.
[3]       Exhibit N, ¶ 4.

techniques, as well as changes in the law.[4] Chief Jones was unaware of, and there was no indication that the Office of the Chief of Police was or has ever been made aware of, any concerns regarding the training or performance of Officer Clark or that he needed any additional training or anything beyond normal supervision and monitoring.[5] At all times relevant hereto, Officer Clark was recognized as an excellent employee and as being well-qualified, well-trained, and professional in the performance of his duties.[6]

## B.    SUPERVISION/DISCIPLINE

At all pertinent times herein TPD had established and enforced a set of written policies and standard operating procedures that regulated the conduct, supervision and corrective action of TPD officers.[7] Each TPD officer was part of a set chain of command, and was supervised by his/her Sergeant, who is the first level supervisor, a lieutenant (Watch Commander), a Captain (District Commander), a Deputy Chief (Bureau Commander) and the Chief of Police.[8]

Each supervisor was charged with the responsibility of providing police officers with adequate training in the various police officer skills, capable direction and guidance, and diligent supervision.  Command staff emphasized the need for

---

[4]       Exhibit N, ¶ 5.
[5]       Exhibit N, ¶ 6.
[6]       Exhibit N, ¶ 7.
[7]       Exhibit N, ¶ 8.
[8]       Id.

quality direction and supervision provided at the direct supervisor (Sergeant) level.[9]

TPD Sergeants directed and observed the officers' daily actions and corrected

those actions where deficient.  Sergeants utilized progressive discipline in

correcting deficiencies, which included counseling, remedial training and if

uncorrected, making recommendations of discipline.[10]

      At all times relevant hereto, TPD maintained policies and procedures for

handling citizen inquiries and complaints made against TPD officers. When an

officer received a low level complaint, such as rudeness or unprofessional conduct,

it was the Sergeant that initially investigated the complaint and decided on the

appropriate corrective action, if any.[11]  If the allegations against an officer were of a

more serious nature, such as the use of excessive force, the matter was referred to

TPD's Internal Affairs Unit and a formal complaint was opened and fully

investigated. At all times relevant hereto, TPD also maintained a corrective

action/discipline policy designed to correct any improper conduct that was

identified and sustained against a TPD officer.[12] If misconduct was sustained

against a TPD officer, appropriate corrective action was promptly taken against

that officer.[13] It was TPD policy that every complaint containing facially plausible

---

[9]      Exhibit N, ¶ 9.
[10]     Exhibit N, ¶ 10.
[11]     Exhibit N, ¶ 11.
[12]     Id.
[13]     Id.

allegations of excessive force or illegal arrest/detention by a TPD officer would be fully investigated by TPD Internal Affairs.[14]

Chief Jones was unaware of, and there was no indication that the Office of the Chief of Police was or had ever been made aware that any complaint containing facially plausible allegations of excessive force or illegal arrest/detention by a TPD officer had not been fully investigated by TPD Internal Affairs.[15]  Neither Quentez Ruffin nor Joshua Ruffin, or anyone on their behalf, ever filed a citizen complaint or inquiry against Officer Clark through TPD's Internal Affairs Section relating to the allegations made in the instant lawsuit.[16]

Prior to July 28, 2007, Officer Clark received minimal discipline and required only normal supervision.  Officer Clark has never had any previous discipline alleging that he had engaged in conduct that may have constituted an illegal arrest/detention or the use of excessive force.  At all times relevant hereto, Officer Clark's written evaluations demonstrate a pattern of outstanding performance.[17]

Chief Jones was unaware of, and there was no indication that the Office of the Chief of Police was or had ever been made aware of, any issue prior to the circumstances giving rise to the instant case involving any supervisor, including

---

[14]     Exhibit N, ¶ 12.
[15]     Exhibit N, ¶ 13.
[16]     Id.
[17]     Exhibit N, ¶ 14.

Officer Clark's supervisor, where the supervisor was alleged to have: (a) failed to identify and properly supervise and correct officers who have been alleged to have failed to properly identify suspects of crimes; (b) failed to identify and correct officers who were alleged to have engaged in illegal or unconstitutional seizures of citizens; or (c) failed to identify and properly supervise and correct officers who have been alleged to have failed to conduct adequate investigations.  Chief Jones has never been advised by any administrative or command staff that they had ever had knowledge of such conduct by supervisors of TPD officers.[18]

Additionally, at all times relevant hereto, TPD utilized an Early Warning Program that identified officers with possible deficiencies that could have become problems. Any officer identified through this program would have received additional remedial measures to address such deficiencies.  Officer Clark was never identified as needing remediation through this program.[19]

Chief Jones was unaware of, and there was no indication that the Office of the Chief of Police was or had ever been made aware of, any issue prior to the circumstances giving rise to the instant case where TPD maintained or tolerated a policy, practice, or custom of its police officers depriving citizens of their constitutional rights, including, but not limited to, the right to be free of unlawful arrests and to be free of excessive force. Chief Jones had never been advised by

---

[18]     Exhibit N, ¶ 15.

any administrative or command staff that they had ever had knowledge of such conduct by TPD officers, including Officer Clark.[20]

TPD had in place in 2007 a set of written directives that established guidelines, policies and procedures for each TPD officer. Specifically relating to the allegations of the instant case, TPD had in place a policy relating to arrests (including <u>Terry</u> stops), investigations, use of force, the use of the Taser, training, supervision and discipline and the investigation of complaints against officers (Internal Affairs).[21]

Chief Jones was unaware of, and there was no indication that the Office of the Chief of Police was or had ever been made aware of, any issue prior to the circumstances giving rise to the instant case where TPD maintained or tolerated a policy, practice, or custom of its police officers ignoring TPD General Orders or failing to monitor compliance with TPD General Orders. Chief Jones had never been advised by any administrative or command staff that they had ever had knowledge of such conduct by TPD officers or investigators, including Officer Clark.[22]

At all times relevant hereto, TPD's General Orders have not come under scrutiny during self-assessments and reviews by outside accreditation

---

[19]     Exhibit N, ¶ 16.
[20]     Exhibit N, ¶ 17.
[21]     Exhibit N, ¶ 18.
[22]     Exhibit N, ¶ 19.

organizations, nor has the failure to adopt or promulgate a General Order or policy

come under scrutiny by outside accreditation organizations nor have such

organizations ever found that TPD has been negligent in its promulgation of

General Orders or policies.[23]

TPD has been accredited by the Commission on Accreditation for Law

Enforcement Agencies (CALEA). Only approximately 10% of all Florida

municipal law enforcement agencies, and approximately 3% of all local, state and

federal law enforcement agencies, are CALEA-accredited. There are five phases in

the accreditation process: (a) Enrollment; (b) Self-assessment; (c) On-site

Assessment; (d) Commission Review and Decision; and (e) Maintaining

Compliance and Reaccreditation.  The CALEA accreditation evaluation process

includes an on-site review by assessors every three years. TPD was first accredited

by CALEA in 1986.  At no time during the CALEA accreditation process or the

self-assessment periods surrounding the accreditation process have TPD's General

Orders or failure to promulgate General Orders relating to the issues raised in the

instant case come under scrutiny.[24]

TPD is also accredited by Commission for Florida Law Enforcement

Accreditation, Inc. (CFA). The CFA is patterned, in part, after CALEA and designs

a series of professional standards for Florida law enforcement agencies to emulate.

---

[23]        Exhibit N, ¶ 20.

Participant agencies must undergo rigorous evaluation of their policies, procedures, and protocols in a wide variety of law enforcement service areas. Pursuant to the CFA accreditation standards, to be accredited TPD must continuously demonstrate compliance with all applicable mandatory standards and not less than 80% of applicable non-mandatory standards. TPD was first accredited by CFA on May 22, 2002, and was reaccredited on June 29, 2005; February 20, 2008; and February 3, 2011. At no time during the CFA accreditation process or the self-assessment periods surrounding the accreditation process have TPD's General Orders or failure to promulgate General Orders relating to the issues raised in the instant case come under scrutiny.[25]

TPD is the fourth longest nationally CALEA-accredited law enforcement agency in the Country. In 2011, TPD achieved "flagship status," meaning that it attained the highest possible rating by CALEA in the accreditation process.[26]

Chief Jones was unaware of, and there was no indication that the Office of the Chief of Police was or had ever been made aware of, any issue prior to the circumstances giving rise to the instant case wherein TPD has been advised that the failure to promulgate a General Order has led to the violation of a citizen's rights. Similarly, Chief Jones was unaware of, and there was no indication that the Office of the Chief of Police was or had ever been made aware of, any issue prior to the

---

[24]     Exhibit N, ¶ 21.

circumstances giving rise to the instant case wherein TPD was advised that its training programs, or failure to train its officers and Investigators regarding a particular subject, had led to the violation of a citizen's rights.  Similarly, Chief Jones was unaware of, and there was no indication that the Office of the Chief of Police was or had been made aware of, any issue prior to the circumstances giving rise to this case wherein TPD has been advised that the process by which the need for certain policies are identified or that the process by which policies are promulgated is deficient.[27]

At no relevant time herein did Chief Jones ever: (a) tolerate or allow TPD officers to engage in the use of excessive force, including the unconstitutional use of the Taser; (b) maintain a policy, custom or practice allowing TPD officers to engage in the use of excessive force, including the unconstitutional use of the Taser; or, (c) have any knowledge or any information about any allegations that TPD officers had engaged in the conduct alleged by plaintiffs in their amended complaint.[28]

## IV.   ARGUMENT

## A.   PLAINTIFFS HAVE NOT PROVEN THE EXISTENCE OF A CITY POLICY OR CUSTOM OF ALLOWING ITS POLICE OFFICERS TO ENGAGE IN THE UNCONSTITUIONAL USE OF FORCE

---

[25]     Exhibit N, ¶ 22.
[26]     Exhibit N, ¶ 23.
[27]     Exhibit N, ¶ 24.
[28]     Exhibit N, ¶ 25.

It is undisputed that the City had no official policy allowing its police officers to engage in the unconstitutional use of force against plaintiffs.  Thus, plaintiffs can establish a § 1983 claims against the City only by proving the existence of a custom of allowing its police officers to engage in such misconduct and that the custom caused Officer Clark to engage in the unconstitutional use of force against each plaintiff.[29] Plaintiffs cannot rely on a theory of respondeat superior to hold the City liable for the actions of its officers.[30]

To prove their claim that the City had a custom of allowing its officers to engage in the unconstitutional use of force, plaintiffs essentially contend that TPD failed or refused to receive, investigate or act on complaints of use of force (or similar complaints) against TPD officers. To prove this contention,  plaintiffs must prove: (1) that Officer Clark engaged in the unconstitutional use of force against each plaintiff; (2) the existence of a continuing, persistent, and widespread practice of unconstitutional use of force by City police officers prior to July 28, 2007; (3) deliberate indifference to or tacit approval of such misconduct by the City's final policymaker after notice of that particular misconduct;[31] and (4) that the custom was the moving force behind the unconstitutional use of force against each

---

[29]     Monell v. Dept. of Social Services, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Grech v. Clayton County, Ga., 335 F.3d 1326, 1329-30 (11th Cir. 2003).

[30]     Monell, 436 U.S. at 691.

[31]     Dennis Jones, TPD's Chief of Police on July 28, 2007, was the City's final policymaker in all instances except for ultimate discipline.

plaintiff.[32] Random acts or isolated incidents are generally insufficient to show a widespread practice.[33]

Here, plaintiffs have not, and in fact cannot, present any admissible evidence: (1) of a widespread practice of TPD officers engaging in the use of unconstitutional force, such as is alleged in the instant case, (2) that the City had knowledge (actual or constructive) of the alleged practice, (3) that the City tacitly authorized the alleged practice, or (4) that the City was deliberately indifferent towards the alleged practice. In fact, the undisputed evidence shows that at all material times herein the City (TPD) maintained and enforced specific written policies relating to arrests, crime investigations, and use of force, including the use of the Taser.

## B.   PLAINTIFFS HAVE FAILED TO PROVE THEIR CLAIM OF FAILURE TO TRAIN/ SUPERVISE

The law is clear that there are only "limited circumstances" where a municipality can be liable under § 1983 for failure to train its employees.[34]  To prevail on their failure to train claim, plaintiffs must establish that the alleged failure was a City custom, and that custom caused Officer Clark to violate plaintiffs' constitutional rights. Failure to train only becomes "deliberate" where in

---

[32]     City of Canton v. Harris, 489 U.S. 378, 389-91(1989); Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991).
[33]     Church v. City of Huntsville, 30 F.3d 1332, 1345 (11th Cir.1994); Depew v. City of St. Marys, 787 F.2d 1496, 1499 (11th Cir. 1986); Griffin v. City of Opa-Locka, 261 F.3d 1295, 1308 (11th Cir. 2001) (quoting Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir.1987)).

light of the duties assigned to specific officers "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need."[35]

Plaintiffs have not, and cannot, present any admissible evidence to support their failure to train/supervise claims. The undisputed evidence shows that at all material times herein that TPD maintained and enforced specific written policies relating to training in numerous areas, including arrests, investigations, and use of force, including the use of the Taser.

In Connick the Supreme Court cautioned that a City's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." [36]   The Court also emphasized that a plaintiff must prove a pattern of similar violations sufficient to establish that the policy of inaction was the functional equivalent of a decision by the City itself to violate the Constitution.[37] The Court reiterated that deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his

---

[34]     Connick, supra; Canton, supra, 489 U.S. at 389-91; Kerr v. City of West Palm Beach, 875 F.2d 1546, 1555 (11th Cir. 1989).
[35]     Riley v. Newton, 94 F.3d 632, 638 (11th Cir. 1996) (citing Canton, at 390).
[36]     Connick at *7 (citing Oklahoma City v. Tuttle, 471 U.S. 808, 822–823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell")).
[37]     Id. at *12.

action.[38]  Finally, the Court pointed out that, "'[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a §1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.'"[39]

## C.   PLAINTIFFS HAVE FAILED TO PROVE A CAUSAL LINK BETWEEN A CITY CUSTOM AND THE ALLEGED CONSTITUTIONAL VIOLATION

In general, for plaintiffs to recover from the City under § 1983, they must satisfy a "rigorous" standard of causation;[40]  they must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[41] Plaintiffs have not met (and cannot meet) this rigorous standard of causation.

The City may be held liable in a § 1983 claim premised on deliberate indifference "where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy **with respect to the subject matter in question**."[42] This requirement has been interpreted in the Eleventh Circuit to require a plaintiff to offer evidence "that the municipality knew of a need to train . . . **in a particular area** and the municipality made a deliberate choice not to take any action."[43] If plaintiffs cannot

---

[38]     Id. at *7.
[39]     Id. at *10.
[40]     Board of the County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 405 (1997).
[41]     Id. at 404.
[42]     Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (emphasis added); Bryan County, 520 U.S. at 406-08; Young v. City of Augusta, GA, 59 F.3d 1160, 1171-72 (11th Cir. 1995); Church, 30 F.3d at 1342-46.
[43]       Gold v. City of Miami, 121 F.3d 144, 1350-51 (11th Cir. 1997) (Emphasis added).

show that the City had notice of a need to train regarding a specific practice, the City "is not liable as a matter of law for any failure to train."[44]

Plaintiffs have not presented, and cannot present, any evidence showing that the City had notice of a need to train in the particular area of use of force or the use of a Taser and deliberately chose not to do so.  In fact, the undisputed evidence shows that the City had no knowledge of a need to train in that particular area.[45]

In contrast to plaintiffs' vague and factually unsupported allegations, the undisputed facts in the record demonstrate that all TPD officers, including Officer Clark, had completed training initially required of all officers as well as additional training in various fields, including annual training in the appropriate use of force and in the proper use of a Taser.  Plaintiffs have not presented, and cannot present, any evidence to establish that the City made a conscious choice not to train its officers reflecting deliberate indifference to the constitutional rights of its citizens as is required by City of Canton.[46]

**D.     PLAINTIFFS HAVE FAILED TO ESTABLISH THEIR STATE LAW CLAIMS FOR EITHER BATTERY OR FALSE IMPRISONMENT AGAINST THE CITY**

The City adopts Officer Clark's arguments set out in Part III B and C of his memorandum of law in support of his motion for summary judgment, in support of

---

[44]     Id. at 1351; Wright v. Shepperd, 919 F.2d 665, 674 (11th Cir. 1990) (noting the City cannot be liable when there is "no evidence of a history of widespread prior abuse. . . [which] would have put [the City] on notice of the need for improved training or supervision."); Popham v. City of Talladega, 908 F.2d 1561, 1564-65 (11th Cir. 1990).
[45]     Generally see Exhibits N..

its argument that plaintiffs have failed to establish their state law claims against the City for battery or false imprisonment, as set forth respectively in Counts I and IV of their complaint.  Should the Court decline to enter summary judgment only as to plaintiffs' state law claims, Officer Clark encourages the Court to dismiss those claims and let them be addressed in a state court forum.[47]

## V.    CONCLUSION

For the foregoing reasons, the City requests this Court grant its motion for summary judgment and enter judgment in its favor and against plaintiffs.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic mail via CM/ECF to Marie A. Mattox,, Esq., and Ganesh Chatani, Esq. on this 17th day of April 2012.

> *s/ Billy J. Hendrix*
> BILLY J. HENDRIX
> Assistant City Attorney
> FBN:  849529
> City Attorney's Office
> 300 South Adams Street, Box A-5
> Tallahassee, FL 32301
> (850) 891-8554
> Fax: (850) 891-8973
> Billy.Hendrix@talgov.com
> ATTORNEYS FOR DOUGLAS CLARK
> AND THE CITY OF TALLAHASSEE

---

[46]    Id.
[47]    Raney v. Allstate Ins. Co., 370 F 3d 1086, 1089 (11th Cir. 2004).