UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JOSHUA J. RUFFIN and                                  CASE NO. 4:11cv344-RH/WCS
QUENTEZ R. RUFFIN,

      Plaintiffs,

v.

CITY OF TALLAHASSEE, DOUGLAS
CLARK, individually, and IPC
INTERNATIONAL CORPORATION,

      Defendants.

_____/

**PLAINTIFFS' RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT CLARK'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, JOSHUA J. RUFFIN and QUENTEZ R. RUFFIN, through their counsel,

hereby file this their Response and Memorandum of Law in Opposition to Defendant Clark's

Motion for Summary Judgment and states:

**I.  FACTS SUPPORTING PLAINTIFFS' CLAIMS**

On July 28, 2007, Joshua Ruffin ("Joshua"),[1] Quentez Ruffin ("Quentez"), Monta' Scott-

Rouise ("Scott-Rouise'"), and Justin Bronson ("Bronson") spent time together playing video

games.  [Exhibit 59 (Joshua Ruffin deposition), pg. 72].  In the evening, they decided to go hang

out at the Tallahassee Mall.  [Exhibit 59 (Joshua Ruffin deposition), pg. 74 ; Exhibit 57 (Joshua

Ruffin affidavit), ¶ 2].  They had not been drinking or taking illegal drugs. [Exhibit 61 (Joshua

Ruffin deposition), pgs. 73-74, 76; Exhibit 57 (Joshua Ruffin affidavit), ¶ 2].  The boys parked

over by AMC and Parisian (Belk). Joshua was carrying his mother's cell phone.  [Exhibit 57

(Marilyn Ruffin affidavit), ¶ 2].

---

[1]  To avoid confusion, Plaintiffs have been identified by their first names.

They first went into Champs or Finish Line to look at shoes and hats. [Exhibit 61 (Joshua Ruffin deposition), pg. 76]. Then Quentez Ruffin needed to return something at a jewelry store. [Exhibit 60 (Scott-Rouise deposition), pg. 20]. When the group came out of the store they were approached by two IPC security guards who told them they were not dressed appropriately because some of them were wearing tank top shirts. [Exhibit 61 (Joshua Ruffin deposition), pgs. 63, 66, 78]; Exhibit 57 (Joshua Ruffin affidavit), ¶ 3]. Joshua told Quentez and his friends to come on and they immediately exited through the nearest door, even though was not the door nearest to where their car was parked, in order to avoid any trouble. [Exhibit 61 (Joshua Ruffin deposition), pgs. 63, 66, 78; Exhibit 57 (Joshua Ruffin affidavit), ¶ 3; Exhibit 45 (Justin Bronson deposition), pg. 25].

The IPC guards followed the group into the parking lot, even though they were leaving. It was only after the Plaintiffs were outside of the Mall and walking away that IPC decided it would issue a trespass warning. [Exhibit 54 (Davis deposition), pgs. 23-25]. One of the IPC guards, Thomas Arnold, requested that the Plaintiffs leave and, as the Plaintiffs were going, Clark stopped them from leaving the property. [Exhibit 58 (Arnold deposition), pgs. 39-41]. The IPC guard, Arnold, told Monta' Scott Rouise (who was 14 at the time) that he would kick his young ass. [Exhibit 61 (Joshua Ruffin deposition), pgs. 81-82]. An argument ensued between the two. [Exhibit 61 (Joshua Ruffin deposition), pgs. 83-84].

Joshua testified that he did not expose himself to the guards, nor did he see anyone else do so. [Exhibit 61 (Joshua Ruffin deposition), pgs. 84-85; Exhibit 45 (Justin Bronson deposition), pg. 49]. No one in the group mooned a security guard. [Exhibit 61 (Joshua Ruffin deposition), pg. 88; Exhibit 60 (Scott-Rouisse deposition), pg. 49]. It is possible that the IPC guard mentioned something about sagging pants but that did not apply to Joshua or Quentez

2

because they did not wear their pants low.  [Exhibit 61 (Joshua Ruffin deposition), pg. 66-67, 79; Exhibit 47 (Quentez Ruffin deposition), pgs. 113-114].  Joshua was so thin that he was in the habit of wearing two or three pairs of shorts and he always wore a belt.  [Exhibit 59 (Marilyn Ruffin affidavit), ¶ 4, n.2.]

As the group continued walking across the parking lot, Clark, who had been called by the IPC guard, cut them off.  [Exhibit 61 (Joshua Ruffin deposition), pg. 94; Exhibit 51 (Douglas Clark deposition), pg. 6].  At his deposition, Clark was unable to recall why the IPC employee had called him on the radio.  [Exhibit 51 (Douglas Clark deposition), pg. 70-71].  He was in a Tallahassee Police Department uniform and was driving a marked patrol car. [Exhibit 61 (Joshua Ruffin deposition), pg .93].

Quentez asked Clark why he was stopping them, since they were trying to leave.  Clark said that he did not have to answer any f-ing questions and he told Quentez and Joshua to get up against his car. [Exhibit 61 (Joshua Ruffin deposition), pgs. 88, 92-94].  Plaintiffs complied with everything he told them to do without cursing, talking back or taking any sort of aggressive action.  [Exhibit 45 (Justin Bronson deposition), pgs. 30-31, 34].  At no time did Plaintiffs turn away from the car, approach Clark or threaten him in any way.  [Exhibit 61 (Joshua Ruffin deposition), pgs. 102, 119, 122-12; [Exhibit 45 (Justin Bronson deposition), pgs. 71,74, 102].

The brothers put their hands on the hood as he instructed, and then Clark ordered them to get on the ground. [Exhibit 61 (deposition of Joshua Ruffin), pg. 95; Exhibit 57 (Joshua Ruffin affidavit), ¶ 7].   Plaintiffs were both complying after Clark ordered them down and Joshua did not appear threatening or non-compliant when Clark suddenly kicked him in the left knee. [Exhibit 45 (Justin Bronson deposition), pgs. 30-31].  Joshua had recently had surgery on this knee, and he had just gotten to the point where he could walk without a brace or crutches.

3

[Exhibit 59 (Marilyn Ruffin affidavit) ¶ 3, n. 1].  He collapsed in great pain and testified that it felt as if his knee had snapped. [Exhibit 61 (Joshua Ruffin deposition), pgs. 99-100].  Prior to the Clark incident, his left knee was stronger than his right because of the recent surgery and rehabilitation.  [Exhibit 57 (Joshua Ruffin affidavit), ¶ 7].  Clark had only asked the Plaintiffs one time to get to the ground before he kicked Joshua.  [ Exhibit 47 (Quentez Ruffin deposition), pgs. 196-197].  Quentez had initially tried to tell Clark that he had back problems and that Joshua had just had surgery on that knee, but Clark's response was to tell him to "shut up and do what the fuck I say because I'm the police," point his taser at the Plaintiffs, kick Joshua directly on his knee, and kick Quentez as he attempted to lower himself to the ground. [Id. at pgs. 154-156].

By the time Joshua hit the ground, Officer Clark had taken out the taser.  Quentez was told by Officer Clark to shut the fuck up and get his punkass on the ground and pointed the taser at Quentez.  Clark demanded that Quentez get all the way down on the ground.  Given that Quentez weighed almost 300 pounds and had a bad back he could not get all the way down in a second.  [Exhibit 57 (Joshua Ruffin affidavit), ¶8].  Quentez said something to Clark about his bad back or messed up back being the reason he was going slowly. [Exhibit 57 (Joshua Ruffin deposition), pgs. 122-123].  Clark did not wait, but stuck Quentez with the taser.  [Id. at pgs.88-89, 97, 100-101,119; Exhibit 60 (Monta' Scott-Rouisse deposition), pgs. 25, 28].

Clark tased him again and Quentez went down.  [Exhibit 57 (Joshua Ruffin affidavit), ¶8].  He tased Quentez at least three times even though he was trying to comply with Clark's demands.  Clark tased Quentez while he was on the ground. [Exhibit 47 (Quentez Ruffin deposition), pg. 157].  Quentez did not fight back or try to rise from the ground during any of the repeated tasings. [Exhibit 47 (Quentez Ruffin deposition), pgs. 161-162].  Clark testified that he

4

had drive-stunned Quentez four times.  [Exhibit 51 (Douglas Clark deposition, pg 87].

When Joshua saw that Clark had his taser out, he pulled out his cell phone to call his mother.  [Exhibit 61 (Joshua Ruffin deposition), pgs. 101,114]  Joshua was trying to call his mother while he was on the ground. [Id. at pgs.101, 114].   It was while he was asking her to come help because they were being attacked by police that Clark stomped on Joshua's hand that held the phone.  [Id at pgs. 120, 125].  His hand was not injured before this time. [Exhibit 61 (Id. at pg. 125].

Ms. Ruffin was at a gathering in Quincy when she heard her mother answer the cell phone and say, "Police! Are you joking?"  Ms. Ruffin grabbed the phone and heard her son yelling that the police were kicking them and hurting them.  In the background she could hear sirens and people yelling.  As she drove to the scene, she received a call from her daughter, who happened to be at the mall. She was crying as she told her mother that Joshua was lying on the ground in his underwear with his hands cuffed behind his back.  Monta Scott-Rouise's mother called with the same report. [Exhibit 59 (Marilyn Ruffin affidavit), ¶ 2].

Joshua was handcuffed, frisked and his jeans shorts, basketball shorts and belt were pulled completely off by Clark and another TPD officer. [Exhibit 61 (Joshua Ruffin deposition), pgs. 126-127].  He spent a period of time face-down in the parking lot, with his hands cuffed behind him, in his underwear, on display to the gathered crowd like an animal, which was very humiliating to him.  [Exhibit 59 (Marilyn Ruffin affidavit), ¶ 4 n. 3].  Joshua was then put in the back of the patrol car; by then his knee and hand were swollen and the knee was bleeding. [Id. at ¶ 4; [Exhibit 61 (Joshua Ruffin deposition), pgs. 126-127].  When Joshua was with Clark in his car and he commented about Clark violating his rights he said, "Oh, you're one of those smart ass niggers, huh?" [Id. at pg. 137]

5

When Ms. Ruffin arrived, she found Quentez, but could not locate Joshua. After she asked where he was, she was shown to a police car.  Joshua was in the back of the patrol car and had been handcuffed and stripped of his jeans shorts, basketball shorts and belt.  Joshua was wearing only his tank top and underwear when he exited the police vehicle.  She could get no explanation why stripping him was necessary.  Someone handed her Joshua's clothes only as she was leaving. [Exhibit 59 (Marilyn Ruffin affidavit), ¶ 4].

Ms. Ruffin began to ask for medical treatment and the police officer who was doing all the talking said that there was nothing wrong with her children. When she informed the officer that Quentez had a back injury and that Joshua had recently had knee surgery, he responded by saying that it was rare that both of them would have serious medical issues like that.  She happened to have some medical documents in her purse to verify the fact. [Id. at ¶ 3; see also Exhibit 47 (Quentez Ruffin deposition), pgs. 162-163].

Eventually, someone in authority said that as long as there was not a trespass warning on file against them, they could leave.  An IPC guard went back into the building and returned with a log of trespass warnings that had been issued.  None of the youths had been previously warned. [Exhibit 59 (Marilyn Ruffin affidavit), ¶ 5].  This was the first and only trespass warning they received that day.  [Id. at pg. 69].  In fact, there is no documentation to substantiate that the Tallahassee Mall or any Defendant issued either Plaintiff a trespass warning prior to the date of the Clark incident at issue in this case. [See Exhibit 50 (Rivenbark deposition), pgs. 9-11; Exhibit 54 (Davis deposition), pgs. 14-19.  The IPC Security Guards were not aware of either Plaintiff being issued a trespass warning prior to July 28, 2007. [See Exhibit 54 (Davis deposition), pgs. 34-35; Exhibit 58 (Arnold deposition), pgs. 15-17].

A trespass warning is issued if no crime has been committed. [Exhibit 51 (Clark

6

deposition), pgs. 79-80].  There needs to be documentation of a prior trespass warning to be able to arrest a person for trespass. [Exhibit 52 (Martinez deposition), pgs. 10-15].  If a trespass warning is issued by an agent of the Tallahassee Mall, a report is prepared to document the warning. [Exhibit 43 (Ellington deposition), pgs. 5-6].  It is unclear whether non-law enforcement mall personnel have the authority to issue a trespass warning. [Exhibit 43 (Ellington deposition), pgs. 6-7].  Instead, the practice at the mall is to call a law enforcement office to the scene to effect at trespass warning. [Id. at pg. 7].

Clark testified that the Mall's call to him for assistance on July 28, 2007, might have included a request to issue trespass warnings. [See Exhibit 51 (Clark deposition), pgs. 69-71].  At the time of the incident Clark was not aware of any existing trespass warnings the Mall had issued against either Plaintiff. [Exhibit 51 (Clark deposition), pg. 109].

There is no indication that the City has investigated Defendant Clark or disciplined him with respect to the Plaintiffs' allegations against him. [See Exhibit 44 (Dillon deposition), pgs. 6-10].  TPD Chief Dennis Jones has done nothing to investigate whether Clark engaged in any wrongdoing. [See Exhibit 48 (Jones deposition), pgs. 5-6].  He has not even reviewed Clark's use of force reports. [Id. at pgs. 20-21].  He did not review anything even after reading Plaintiffs' allegations in this case even though he agrees that the facts pled would cause him concern that Clark utilized excessive force. [See id. at pgs. 22-23].  None of Clark's supervisors have asked him any questions about the incident since the Plaintiffs indicated their intent to sue. [Exhibit 51 (Clark deposition), pgs. 36-37].  TPD has not questioned Officer Guimaraes, who responded to the scene, about the events. [Exhibit 53 (Guimaraes deposition), pgs. 8-11].  TPD's Training Sergeants have no knowledge of Clark receiving re-training or being scheduled to receive re-training based on Plaintiffs' allegations. [See Exhibit 49 (Vaughn deposition), pgs. 14-15;

7

Exhibit 56 (Outlaw deposition), pgs. 4, 7].

IPC paid Clark for working off duty. [Exhibit 50 (Rivenbark deposition), pgs. 13-14]. Clark attended an orientation for IPC in which he was explained the rules they seek to enforce. [Exhibit 51 (Clark deposition), pg. 10].  IPC dictates the schedule of the officer. [Exhibit 53 (Guimaraes deposition), pgs. 16-17].  Clark was not aware of any rules, policies, or procedures put in place by IPC that governed his work at the Mall. [Exhibit 51 (Clark deposition), pg. 11]. He did not receive any training from IPC. [Exhibit 51 (Clark deposition), pgs. 11-12].

In his Use of Force Report on Joshua Ruffin [Exhibit 17], Clark wrote that Joshua refused to back away from him despite his commands.  It does not state how far away Josh was from him. [Exhibit 17].  Those facts, according to the Report, prompted the 'roundhouse kick'. [See id.].  In his Use of Force Report on Quentez Ruffin, Clark does not describe facts to indicate that Quentez was being physically threatening to Clark. [See Exhibit 19].  No one from TPD administration has ever notified Clark that what he described in these Use of Force Reports was inconsistent with any TPD policy or procedure. [Exhibit 51 (Clark deposition), pgs. 33-34]. TPD does not investigate any incident unless the complaint is made through its internal affairs unit. [See Exhibit 48 (Jones deposition), pgs. 10-11, 31-32].  Lawsuits and notices of intent to sue do not trigger TPD to investigate the actions of the officers identified in such papers. [See id.].  An exception to that rule is if the officer is alleged to have killed someone, because "[t]hat's a serious allegation." [See id. at pgs. 25-26].  "If this had been serious enough [to prompt the Plaintiffs to file an internal complaint with TPD]" the Department would have conducted an internal investigation into Clark's conduct. [See id. at pg. 28].

A TPD officer is not authorized to kick a subject who is not offering resistance. [Exhibit 49 (Vaughn deposition), pgs. 8-9].  He is not authorized to use *any* force on a subject who is

complying with his directives. [Id. at pg. 9].   Officers recognize that what Plaintiffs allege constituted excessive force. [See Exhibit 49 (Vaughn deposition), pgs. 12-13].   Even Clark himself agrees that drive stunning a subject who was compliant on the ground would be deemed excessive force. [See Exhibit 51 (Clark deposition), pgs. 105-107.   Clark understood that if Joshua Ruffin was complying with his direction that kicking him could be deemed excessive force. [Exhibit 51 (Clark deposition), pgs. 62-63].   Other officers recognize that what Plaintiffs allege would not have given Clark probable cause to arrest either of them. [See Exhibit 46 (Fallis deposition), pgs. 7-8; Exhibit 49 (Vaughn deposition), pgs. 19-20].

The Ruffin family originally set out for Tallahassee Memorial Hospital, but Clark followed them there and parked around by the ambulances.   He was not escorting them.   This made the family very uncomfortable, so they ended up going to Capital Regional Medical Center instead where Plaintiff were treated.   [Exhibit 59 (Marilyn Ruffin affidavit), ¶ 6].

Defendants attempt to downplay the physical and emotional consequences of the actions by Clark, which were quite serious.   Joshua was in a cast for six or eight weeks. His doctor told him that the damage to his hand meant he would never be able to palm a basketball again. The knee that had just recovered was reinjured.   Joshua loved basketball and was an outstanding high school player. His dream of playing basketball in college was dashed that summer after he graduated.   In addition, Joshua has suffered from headaches from time to time since childhood, but now they are constant.  [Exhibit 59 (Marilyn Ruffin affidavit), ¶ 7]

At the hospital, it was discovered that Clark had tased Quentez on his testicles.  [Id. at ¶8].   Quentez had suffered an injury to his back in an automobile accident.   After the Clark incident the pain in his back significantly worsened. [Id. at ¶ 8; Exhibit 47 (Quentez Ruffin deposition), pgs. 39-40]. This is why he cursed and asked for somebody to call the "real police".

9

[Exhibit 59, (Marilyn Ruffin affidavit), ¶ 8].

Ms. Ruffin states that she told her sons from an early age that they already had two strikes against them: they were black and they were male.  She taught them that if they were ever approached by any kind of law enforcement officer, they should put up their hands and comply with whatever they were asked to do, and everything would be fine.  Ms. Ruffin did not know how to respond when Joshua said, "Mama, I did everything you told me to do and he still kicked me."  Ms. Ruffin asked Joshua what he could have done differently to avoid the incident.  Her son told her the only thing he could have done to prevent it was to "change the color of his skin" which was impossible [Id. at ¶ 9].

The disillusionment caused by the Clark incident had an enormous impact on Plaintiffs. They stopped trusting anyone, and not just law enforcement.  Joshua's resulting depression resulted in the loss of his friends and the desire to take his own life.  The Clark incident led to a rift between the Plaintiffs sons which was only healed days before Quentez's murder.  The Plaintiffs' sister, who was at the mall to see a movie, witnessed her brother lying handcuffed on the pavement in his underwear.

Plaintiffs have demonstrated that there exist many disputed issues of material fact to be resolved by a jury.  Plaintiffs respectfully request that they be left to a jury and that Defendant's Motion for Summary Judgment be denied in its entirety.

## II.    STANDARD OF REVIEW

To win this Motion for Summary Judgment, Defendant must show that everything in the record . . . demonstrates that no genuine issue of material fact exists.  Tippens v. Celotex Corp., 805 F.2d 949, 952 (11th Cir. 1986).  Genuine issues of fact are those where the evidence is such that a reasonable jury could return a verdict for the non-movant.  See e.g. Anderson v. Liberty

Lobby, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).  In deciding whether a genuine issue of material fact exists, the Court must accept the truth of Plaintiff's allegations and evidence and "must draw all reasonable inferences in Plaintiff's favor." Cottrell v. Caldwell, 85 F.3d 1480, 1486 n.3 (11th Cir. 1996).  Based on the record evidence presented in this case, the Defendant's Motion for Summary Judgment should be denied.

### III.  PLAINTIFFS'  HAVE PROVEN THEIR § 1983 FALSE IMPRISONMENT CLAIM

#### A.  Qualified Immunity Does not Protect Clark

Qualified immunity protects government officials if they are performing discretionary functions and only if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982)); see also Priester v. City of Riviera Beach, 208 F.3d 919 (11th Cir. 2000); Slicker v. Jackson, 215 F.3d 1225, 1232 (11th Cir. 2000); Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000).  "In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the alleged acts occurred." Lee v. Ferraro, 284, F.3d 1188, 1194 (quoting Courson v. McMillan, 939 F.2d 1479, 1487 (11th Cir 1991)).  If the defendant can establish that he was acting within the scope of discretionary authority, the burden shifts to the Plaintiff to show why qualified immunity does not apply.  Id.

In Saucier v. Katz, 533 U.S 194 (2001), the Supreme Court established a two part test in evaluating a claim of qualified immunity.  Id. First, as a threshold question, courts must ask, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id.  Then, "If a constitutional right would have been violated under the *plaintiff's* version of the facts, the court must then determine whether the

right was clearly established." Id.

While it is undisputed that Clark was acting within the scope of his discretionary authority, at issue is whether his conduct violated the Plaintiffs' constitutional rights. More specifically, the issue is whether the Defendant's conduct was reasonable in light of the facts confronting him. Plaintiffs contend and the record indicates that it was not.

Qualified immunity is unavailable to Clark through his willful blindness to the facts in an overzealous attempt to arrest someone. A qualified immunity analysis charges the officer with "possession of all the information reasonably discoverable by an officer acting reasonably under the circumstances." Sevigny v. Dicksey, 846 F.2d 953, 957 n.5 (4th Cir. 1988). "A police officer may not close his or her eyes to facts that would help clarify the circumstances of an arrest." BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986).

### B. There Was No Probable Cause to Detain or Arrest Plaintiffs

"Probable cause is constitutionally required in warrantless arrest cases to protect society from unreasonable intrusions by the state." LeGrand v. Dean, 564 So.2d 510, 512, (Fla. 5th DCA 1990)(citing United State v. Bowers, 458 F.2d 1045 (5th Cir.)). "The substance of all the definitions of probable cause 'is a reasonable ground for belief of guilt.'" Nolin v. Town of Springville, et al., 45 F.Supp.2d 894 (M.D. Ala. 1999) (quoting McCarthy v. Dearmit, 99 Pa. 63, 69 (1881). "The standard for determining probable cause to arrest is what a reasonable person would believe knowing all of the facts known to the officer." LeGrand, at 512 Further, the question of whether probable cause exists is one for the jury when material facts are in controversy. Id.

In the present case, Defendant Clark did not even have arguable probable cause to detain much less arrest either Plaintiff. "To determine whether arguable probable cause exists, courts

12

must look to the totality of the circumstances." Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006).  At the summary judgment stage, courts view the totality of the circumstances in the light most favorable to the nonmoving party.  Id.  The court "must construe the facts and draw all inferences in the light most favorable to the nonmoving party and "when conflicts arise between the facts evidenced by the parties, [ ] credit the nonmoving party's version."  Id. (citing Evans v. Stephens, 407 F.3d 1272, 1277 (11th Cir. 2005).

In this case, Plaintiffs were complying with the directive of the IPC guard to leave the Mall.   In fact, they were walking towards their car when Clark stopped them.  There was no allegation that they did anything wrong other than wear tee shirts.  There was no allegation of theft or other crime.  They were walking away- just as they were told to do.

A claim for false arrest is viable where the officer continues to detain a suspect after his suspicions  have been eased.  E.g. Jessup v. Miami Dade-County, 2011 WL 3861690 at *3 (11th Cir. 2011)(denying summary judgment on false imprisonment claim where officers' initial reasonable suspicion of a crime vanished over time, thus no lawful basis persisted for the continued detention); Croom v. Balkwill, 645 F.3d 1240, 1251 n.15 (11th Cir. 2011) (noting that investigative stops must "cease one law enforcement's reasonable, articulable suspicions of [detainee are] allayed").

Plaintiffs' words could not have constituted arguable criminal obstruction or resistance. "As we all know, [t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."  L.A.T. v. State, 650 So.2d 214, 217 (Fla. 3d DCA 1995), quoting City of Houston v. Hill, 482 U.S. 451, 462-63, 107 S.Ct. 2502, 2510, 96 L.Ed.2d 398, 412-13 (1987).

## C.  The Law was Clearly Established in 2007

The law is clearly established that officers must have probable cause to place a person in custody.  See Davis v. Williams, 451 F.3d 759, 764 (11th Cir. 2006) ("There is no question that it is clearly established that an arrest made without probable cause violates the Fourth Amendment."); see also United States v. Brignoni-Ponce, 422 U.S. 873, 882, 95 S.Ct. 2574, (1975)(noting that any "further detention or search" beyond investigative questioning pursuant to Terry "must be based on consent or probable cause.").  Here, as articulated above, neither probable cause or arguable probable cause existed.

"There is no question that an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment."  Madiwale v. Savaiko, 117 F.3d 1321 (11th Cir. 1997) (citing Von Stein v. Brescher, 904 F.2d 572, 579 (11th Cir. 1990); Herren v. Bowyer, 850 F.2d 1543 (11th Cir. 1988).  When a defendant officer makes deliberately false statements to support a false arrest, there is a clear violation of a plaintiff's constitutional rights.  See Holmes v. Kucynda, 321 F.3d 1069 (11th Cir. 2003)(court held that qualified immunity  "does not offer protection if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff").

Defendant's argument wrongfully presupposes that - as a matter of law - he had probable cause to arrest Plaintiffs.  He did not.  Even if either Plaintiff had opposed Clark's lawful commands - which they did not - Plaintiffs' "resistance" was not the sort Florida courts deem unlawful under  §843.02, Florida Statutes (resisting arrest without violence), or any Florida statute.  A person is privileged to resist peacefully an unlawful arrest.  E.g. Lee v. State, 368 So.2d 395 (Fla. 3d DCA 1979), cert. denied 378 So.2d 349 (Fla. 1979).  Physical conduct must usually accompany offensive words to support a conviction under §843.02.  Francis v.

14

State, 736 So.2d 97, 99 (Fla. 4th DCA 1999).  Defendant Clark could not reasonably have thought that either Plaintiff's actions constituted obstruction of his performance of a legal duty. D.G. v. State, 661 So.2d 75 (Fla. 2d DCA 1995).

A reasonable officer would understand Plaintiffs' words to be constitutionally protected speech.  See W.L. v. State, 769 So.2d 1132, 1133 (Fla. 3d DCA 2000) (reversing on First Amendment grounds juvenile's adjudicated delinquency when juvenile yelled series of profanities at officers but did not physically interfere or physically threaten the officers).  As the court explained in Wilkerson v. State: "We have no doubt that the use of 'oppose' in conjunction with 'obstruct' manifests a clear and unambiguous legislative intent to proscribe only acts or conduct that operate to physically oppose an officer in the performance of lawful duties." 556 So.2d 453, 455-56 (Fla. 1st DCA 1990); see also State v. Dennis, 684 So.2d 848, 849 (Fla. 3d DCA 1996) (holding police did not have probable cause to arrest defendant for violation of section 843.02 when defendant was yelling street term "ninety nine" which means police were in the area while undercover officers were attempting drug bust of drug dealer); D.G., 661 So.2d at 76 (finding juvenile's verbal protests and refusal to answer officer's questions, unaccompanied by physical opposition or threats, did not constitute obstruction).

Clark had no basis to detain or arrest Plaintiffs.  It was clearly established in 2007 that an officer cannot arrest someone for asking a question.  Because Clark possessed no arguable probable cause to believe Plaintiffs had committed a crime.[2]  He is not entitled to immunity.

---

[2]    Probable cause determinations should not "stand principally on the unsupported statements of interested officers, when those statements have been challenged and countered by objective evidence."  Kingsland v. City of Miami, 382 F.3d 1220, 1228 (11th Cir. 2004).

In Kingsland, the plaintiff was involved in an automobile accident with an off-duty City of Miami police officer.  Id. at 1223.  Kingsland alleged that the officer ran a red light and hit her.  The officer claimed it was Kingsland who ran the light.  Id.  Seemingly, in an effort to

## IV.  SUMMARY JUDGMENT ON PLAINTIFFS' EXCESSIVE FORCE CLAIM IS IMPROPER

### A.  Clark Violated the Plaintiffs' Right to be Free from Excessive Force

The force Clark used on Plaintiffs was excessive and in violation of their constitutional

rights under the Fourth Amendment thus, the defense of qualified immunity should not be

extended to him.   To determine whether the force used by Clark was proper and not excessive,

the court must ask "whether a reasonable officer would believe that this level of force is

necessary in the situation at hand." Willingham v. Loughnan, 261 F.3d 1178, 1186 (11th Cir.

2001).  The Eleventh Circuit determines the reasonableness of force by examining (1) the need

of the application of force, (2) the relationship between the need and amount of force used, and

(3) the extent of the injury inflicted. Leslie v. Ingram, 786 F.2d 1533, 1536 (11th Cir. 1986).  The

---

protect the officer, Kingsland was arrested and charged with careless driving, reckless driving, and DUI despite the fact that she passed several Breathalyzer tests which came back negative with 0.000% alcohol content.  Id. at 1224-1225.  Additional tests were performed on Kingsland, including walking a straight line, touching her nose, and closing her eyes while extending arms. Id. at 1225.  She also gave a urine specimen which came back negative for cannabis as the officer's also claimed to smell cannabis on her breath and in her truck.  Id.

Kingsland filed suit alleging false arrest and malicious prosecution.  The district court granted summary judgment.  Kingsland also asserted that the officers had a conflict of interest and motive for covering up wrongdoing Id. at 1128, footnote 9.  She claimed, like Jones claims here, that the officers fabricated facts and evidence to support a finding of probable cause.  The Eleventh Circuit reversed reasoning that the record contained evidence that contradicted the defendants' version of events sufficient to overcome summary judgment.

Eloy v. Guillot, 2008 WL 2697211 (11th Cir. 2008) is also instructive. In Eloy, the Eleventh Circuit found that under the plaintiff's version of the facts, plaintiff had done nothing to give the officer probable cause to arrest him.  Id. at *3.  He was not drinking, did not possess crack cocaine and did not resist arrest.  Id.  The officer "intentionally lied in the arrest affidavits and fabricated evidence because [the officer] and/or his supervisor wanted to arrest Eloy . . .." Id.  Therefore, the Court concluded, the plaintiff's version of the facts established a warrantless arrest without probable cause and thus a Fourth Amendment violation.  Id.  See also Franks v. Delaware, 438 U.S. 154 (1978)(held that an officer violates the Fourth Amendment when he swears to false information knowingly or with reckless disregard for the truth where that false information is material to the finding of probable cause).

"reasonableness" of the force is judged using an objective standard under the totality of the circumstances, without regard to the officers' underlying intent.  Graham v. Connor, 490 U.S. 386, 389, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).

It was objectively unreasonable for Clark to use violent force on Plaintiffs, who posed no physical threat and complied with his requests. See Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008)(denying officer qualified immunity where officer struck suspect once in the stomach even though suspect did not resist arrest, disregarding any of officer's subjective belief of danger). He kicked Joshua Ruffin and stomped on his hand only because he asked a question. He tased Quentez Ruffin four times when he was moving too slowly to get on the ground because of his bad back, which he told Clark about.  Clark had no lawful basis to kick or tase either Plaintiff and the force he used against them was excessive.  See Sheth v. Webster, 145 F. 3d 1231, 1238 (11th Cir. 1998)("the district court was likewise correct in holding that Webster was not entitled to qualified immunity on plaintiff's excessive force claim.  Under plaintiff's allegations, Webster pushed her against a soda machine, handcuffed her, and dragged her to the police car.  There is no evidence in the record to suggest that plaintiff posed a danger to the officer or others.  Accordingly, because of the absence of any justification for Webster's use of force, application of the Fourth Amendment reasonableness standard would inevitably lead every reasonable officer . . . to conclude that the force was unlawful."); see also Post v. City of Fort Lauderdale, 7 F. 3d 1552, 1559 (11th Cir. 1993).

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force".  Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002)(quoting Graham v. Connor, 490 U.S. 386, 396 (1989)); see also Vineyard, 311 F.3d at 1348.  To determine whether the amount of force a police officer uses is

proper, courts must ask, "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." Lee, 284 F. 3d at 1197 (quoting Willingham v. Loughnan, 261 F.3d 1178, 1187 (11th Cir. 2001)).  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. (quoting Graham, 490 U.S. at 396).  This balancing of interests compels a court to evaluate several factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (quoting Graham, 490 U.S. at 396).  There was nothing that Plaintiffs did, nor is there anything in the probable cause affidavit to support, that would justify the use of force used by Clark in this case.  Even Clark's fellow officers, when asked during depositions whether the facts pled, if true, would constitute excessive force to which they all replied that "they would."

    **I.**       **The severity of the crime at issue**

The severity of the offense is an important consideration in determining whether the use of force was justified.  Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 1998).  In Lee, the Eleventh Circuit held that a police officer was not entitled to qualified immunity on the plaintiff's §1983 excessive force claim.  Lee, 284 F.3d at 1197.  The plaintiff was arrested for improperly honking her horn on a busy city street during rush hour.  After the officer pulled the plaintiff over, the officer hurled a flurry of racial insults at her, grabbed her wrist to pull her out of the car, and shoved her face first against the car.  After she was placed in handcuffs and was secured, the officer slammed her head against the trunk while spreading her legs with his foot. The Lee court reasoned that, "[b]ased on the Lee's account of the facts, it is abundantly clear to

us that Ferraro used force that was plainly excessive, wholly unnecessary, and indeed, grossly disproportionate under Graham," particularly since her only "crime" was honking her horn during rush hour.  Lee, 284 F.3d at 1198.

In the instant case, Clark also used force that was plainly excessive, wholly unnecessary, and grossly disproportionate.  Plaintiffs allegedly committed the minor offense of disorderly conduct, which is disputed and is an after the fact justification to cite them for something that they did not do.  But even if Plaintiffs were disorderly, which they dispute, the force used by Clark was unreasonable.  Graham establishes that "more force is appropriate for a more serious offense and less force is appropriate for a less serious one. . .' Id.  Clark's attempt to justify the level of force used is an illogical and baseless application of the law.   Consequently, the first factor weighs heavily in the Plaintiff's favor.

In Vinyard, the plaintiff brought a 1983 claim against a police officer for excessive force during her arrest. The officer bruised the plaintiff's arm and her breast, pulled her by her hair and sprayed her in the face with pepper spray.  Id. at 1343.   The plaintiff, admitting that she may have gotten "a little rowdy" with two female officers at the jail, subsequently pled guilty to obstructing a law enforcement officer as part of a plea agreement disposing of the criminal charges against her.  Id. at 1344.  The Eleventh Circuit found that all the Graham factors weighed in the plaintiff's favor.  Id. at 1347.  Her crimes of disorderly conduct and obstruction of a law enforcement officer were of minor severity.  Id.  Not locating a Supreme Court or Eleventh Circuit decision regarding pepper spray, the Court noted that other courts have "consistently concluded that using pepper spray is excessive force in cases where the crime is a minor infraction, and there is no threat to the officers or anyone else."  Id. at 1348.   Under these facts, the Court held that the officer's conduct constituted unreasonable and excessive force in

violation of plaintiff's constitutional rights.  Id. at 1349.

As in Vinyard, Plaintiffs were alleged to have engaged in a "crime" of minor severity, disorderly conduct.  This factor weighs in Plaintiffs' favor.

**ii.    Plaintiffs Posed No Threat to the Safety of Officers or Others**

An officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts and the circumstances in which he is confronted.  Deorle v. Rutherford, 272 F.3d 1271 (9th Cir. 2001).   As in Lee, there is absolutely no evidence indicating that Plaintiffs  posed any threat to the arresting officer.  The Vinyard court reasoned that while the plaintiff's conduct may have been a nuisance, it did not pose a threat to the safety of the officers or others.  Vinyard, 311 at 1347.

Plaintiffs were unquestionably not a threat to anyone's safety given that they were unarmed, they were not battering Clark while being detained, and they did not verbally threaten him.  They were kids leaving the mall because they weren't dressed correctly.  They were not a threat to nor did they threaten anyone.

**iii.    Plaintiffs were not actively resisting arrest or attempting to evade**

Plaintiffs were not actively or intentionally resisting arrest nor were they attempting to evade arrest by flight.  Slicker v. Jackson, 215 F.3d 1225 (11th Cir. 2000) is controlling. In that case, the plaintiff testified : "I was leaving the city building, the police station and Kendricks said I was under arrest for disorderly conduct. . . [Kendricks] put the handcuffs on my arm and tried to put my arm over my head which I can't do.  I was like, let me put them behind my back. And he grabbed ahold of my head and Fulmer had the cuffs on my hands and he put it behind my back and Kendricks grabbed ahold of the top of my head up there and slammed my head in the pavement."  Id. at 1227.  The officers in Slicker slammed this plaintiff's head in the pavement,

knocked him unconscious and kicked him in the leg and in the back of his head all because he could not comply with the order to put his arm over his head.  The Eleventh Circuit affirmed holding that Slicker presented enough evidence to raise a question of fact as to whether the officers used excessive force in arresting him.  Id. at 1229.

Because the Graham factors weigh heavily in favor of plaintiffs, this Court must conclude that kicking, stomping and tasing Plaintiffs constituted unreasonable and excessive force in violation of Plaintiff's constitutional rights. See  Buckley v. Haddock, 2007 WL 710169 (Graham factors weighed heavily in plaintiff's favor where he was charged with minor crime of speeding, he never posed a threat to the officer or the safety of anyone else, and he never actively resisted arrest; force was so "plainly unnecessary and disproportionate, no reasonable officer could have had a mistaken understanding as to whether [the] particular amount of force [was] legal in the circumstances"). "Qualified immunity is not appropriate when the Graham analysis yields answers that is clear beyond all doubt."  Lee, 284 F.2d at 1200.  As the Lee court concluded, this is such a case.

### B.  Clark Violated Clearly Established Law.

Clark is  not entitled qualified immunity because he violated clearly established law.  The constitutional right to be free from excessive force was clearly established at the time of the violation of Plaintiffs' rights on [date].  "The relevant, dispositive inquiry in determining whether a right is *clearly* established is whether it would be *clear* to a reasonable officer that his conduct was unlawful in the situation he confronted."  Vinyard, 311 F.3d at 1350 (citing Saucier v. Katz, 533 U.S. at 202)(emphasis added).  One way to show that a constitutional right was clearly established is to find case law that is factually analogous.  However, in the absence of factually analogous case law, a violation may be of such "obvious clarity" that factually

21

analogous case law is unnecessary. Id.   The Supreme Court made this clear in Hope v. Pelzer,

122 S.Ct.2508, stressing that preexisting caselaw with "materially similar" or "fundamentally

similar" facts is not always necessary to give an official "fair warning" of unlawful behavior.

Willingham v. Loughnan, 321 F.3d at 1301l see also Boyd v. Benton, 374 F.3d 773, 781 (9th Cir.

2004) (qualified immunity is not appropriate merely because no cases directly address a

situation.  Rather, when an officer's conduct "is so patently violative of the constitutional right

that reasonable officials would know without guidance from the courts that the action was

unconstitutional, closely analogous pre-existing case law is not required to show that the law is

clearly established.").

In Smith v. Mattox, 127 F.3d 1416 (11th Cir. 1997), the Plaintiff alleged that the

defendant police officer used excessive force in violation of the Fourth Amendment by breaking

his arm during the course of an arrest. On interlocutory appeal, the defendant contended that no

controlling, published opinion existed prior to the date of the alleged constitutional violation that

would have put him on notice that the force he used to effect the arrest was excessive.  The

Eleventh Circuit disagreed and held that excessive force in an arrest clearly violates the Fourth

Amendment.  Id. at 1418.  The Court explained, ". . . an excessive-force plaintiff can overcome

qualified immunity. . . by showing that the official's conduct lies so obviously at the very core of

what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent

to the official, notwithstanding the lack of caselaw."  Id. at 1419. The Court further reasoned that

the officer's conduct was "far beyond the hazy border between permissible and forbidden force"

and concluded that "this case falls within the slender category of cases in which the unlawfulness

of the conduct is readily apparent even without clarifying caselaw."  Id. at 1420; see also e.g.

Priester v. City of Riviera Beach, 208 F.3d 919, 927 (11th Cir. 2000)(concluding law was clearly

established and force was "clearly excessive-even in absence of any case law" when officer released police dog to attack plaintiff who was lying on the ground, did not pose a threat to officers or to anyone else, and was not attempting to flee or resist arrest); Jenkins v. Talladega City Bd. Of Educ., 115 F.3d 821 n. 3 (11th Cir. 1997)(recognizing exception to requirement for factually similar cases where conduct so clearly unlawful that preexisting caselaw unnecessary); Rodgriguez v. Farrell, 280 F.3d 134, 1350 n. 18 (11th Cir. 2002) ("We very occasionally encounter the exceptional case in which a defendant officer's acts are so egregious that preexisting, fact-specific precedent was not necessary to give clear warning to every reasonable (by which we, in the qualified immunity context, always mean every objectively reasonable) officer that what the defendant officer was doing must be 'unreasonable' within the meaning of the Fourth Amendment."); Skrtich v. Thornton, 280 F.3d 1295, 1304 n. 9 (11th Cir. 2001)("Some conduct is so obviously contrary to constitutional norms that even in the absence of caselaw, the defense of qualified immunity does not apply."); Brent v. Ashley, 247 F.3d 1294, 1303 n. 10 (11th Cir. 2001)(noting general statements of law capable of giving fair warning to officials); Lee, 284 F.3d at 1199 (denying qualified immunity without particularized precedent in excessive force case).  In holding that the officer was not entitled to qualified immunity under the plaintiff's version of the facts, the court in Lee held, "[s]imply put, the grossly disproportionate force used in this case was clearly established as a constitutional violation because no reasonable officer could have believed that Ferraro's actions were legal." Lee, 284 F.3d at 1199.

In Woods v. Valentino, 2007 WL 1427045 (M.D. Fla. 2007), the plaintiff alleged that the defendant officers used excessive force when arresting him, breaking his left wrist and causing permanent damage to his right foot and ankle.  The Wood court held that qualified immunity was improper when, "accepting the Plaintiff's version of the facts as true, a reasonable jury could

23

find that the Officer Defendants' actions constituted unlawful excessive force.  The Plaintiff was

not suspected of having committed a serious crime, did not pose an immediate threat to anyone,

and did not actively resist arrest.  Yet, the Officer Defendants pinned him behind a solid steel

door, breaking his wrist and injuring his foot and toes, grabbed him by the hair and coated his

face and body with pepper spray."  Id.  The Court further reasoned, "[a]ssuming these facts are

true, a reasonable officer should have known that using such force to effect a misdemeanor arrest

in this situation would be impermissible."  Id.

As in Lee, Woods and the other cases cited above, including Slicker v. Jackson, 215 F.3d

1225 (11th Cir. 2000), cited above, the officers in the instant case could not reasonably believe

that it was legal to apply the amount of force to effectuate an arrest under these circumstances.

The facts of this case are "so far beyond the hazy border between excessive and acceptable force

the defendants had to know that they were violating the Constitution even without caselaw on

point."  "When an excessive force plaintiff shows 'that the official's conduct lies so obviously at

the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was

readily apparent to the official, notwithstanding caselaw,' " the official is not entitled to the

defense of qualified immunity.  Priester, 208 F.3d at 926.  These officer's actions was so plainly

unnecessary and disproportionate that no reasonable officer could have had a "mistaken

understanding as to whether [the] particular amount of force [was] legal in the circumstances."

Lee, 384 F.3d at 1200.   The same is true here.

### V.  CLARK COMMITTED BATTERY, FALSE IMPRISONMENT AND THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ON PLAINTIFFS

Plaintiffs adopt their arguments set out in Section III above regarding their false

imprisonment claims under state law.  For the reasons set forth above, summary judgment

24

should be denied on this claim.

As for Plaintiffs claim for the intentional infliction of emotional distress, the elements of this claim are: (1) the wrongdoer's conduct was intentional or reckless. . . (2) the conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe." Johnson v. State Dept. of Health and Rehabilitative Services, 695 So.2d 927, 929 (Fla. 2nd DCA 1997) (quoting Dominguez v. Equitable Life Assurance Soc'y, 438 So.2d 58, 59 (Fla. 3d DCA 1983)).  Here, the Defendants' conduct was certainly reckless if not intentional.  As to the second prong, if kicking, stomping and tasing a man for walking to his car is not outrageous conduct, then nothing is.  Clark's actions caused Plaintiffs significant emotional distress, as shown in their Statement of Facts above.

Additionally, they have provided allegations in their Statement of Facts such that the recitation of those facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"  Id. (quoting Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277, 279 (Fla 1985).[3]

On their state law battery claim, Plaintiff's rely on the facts supporting their excessive force claim in Section IV above in arguing that summary judgment should be denied on that claim too.

---

[3]    See also Williams v. City of Daytona Beach, supra. (finding Defendants' argument that the facts of the case did not state a claim for intentional infliction of emotional distress without merit and holding that plaintiff alleged sufficient facts to demonstrate extreme and outrageous conduct that goes beyond all normal bounds of decency where Plaintiff testified that Defendant officers choked, kicked, and punched him after he had already been subdued).

## VI.  CONCLUSION

Defendant Clark's Motion for Summary Judgment should be denied in all respects for the

reasons set forth above.

Respectfully submitted,


/s/   Marie A. Mattox
Marie A. Mattox (FBN: 0739685)
MARIE A.  MATTOX, P.A.
310 East Bradford Road
Tallahassee, FL 32303
Telephone: (850) 383-4800
Facsimile:  (850) 383-4801
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served upon
all counsel of record by CM/ECF this 9th day of May, 2012.


/s/ Marie A. Mattox
Marie A. Mattox